# SIMON, SECRETARY OF THE TREASURY, ET AL. v. EASTERN KENTUCKY WELFARE RIGHTS ORGANIZATION ET AL.

No. 74–1124. Argued December 10, 1975—Decided June 1, 1976*

---

*Together with No. 74–1110, *Eastern Kentucky Welfare Rights Organization et al.* v. *Simon, Secretary of the Treasury, et al.,* also on certiorari to the same court.

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, White, Blackmun, and Rehnquist, JJ.,

28

joined. STEWART, J., filed a concurring statement, *post*, p. 46. BRENNAN, J., filed an opinion concurring in the judgment, in which MARSHALL, J., joined, *post*, p. 46. STEVENS, J., took no part in the consideration or decision of the cases.

*Stuart A. Smith* argued the cause for petitioners in No. 74–1124 and respondents in No. 74–1110. With him on the brief were *Solicitor General Bork, Assistant Attorney General Crampton, Ernest J. Brown, Leonard J. Henzke, Jr.,* and *Robert A. Bernstein.*

*Marilyn G. Rose* argued the cause for respondents in No. 74–1124 and petitioners in No. 74–1110. With her on the briefs was *Joseph N. Onek.*†

MR. JUSTICE POWELL delivered the opinion of the Court.

Several indigents and organizations composed of indigents brought this suit against the Secretary of the Treasury and the Commissioner of Internal Revenue. They asserted that the Internal Revenue Service (IRS) violated the Internal Revenue Code of 1954 (Code) and the Administrative Procedure Act (APA) by issuing a Revenue Ruling allowing favorable tax treatment to a nonprofit hospital that offered only emergency-room services to indigents. We conclude that these plaintiffs lack standing to bring this suit.

I

The Code, in its original version and by subsequent amendment, accords advantageous treatment to several types of nonprofit corporations, including exemption of

---

†Briefs of *amici curiae* urging reversal were filed by *Stanton J. Price* for the American Public Health Assn., and by *Stanley Christopher* and *Russell D. Jacobson* for Jackson County, Mo.

*Robert S. Bromberg* filed a brief for the American Hospital Assn. as *amicus curiae* urging affirmance.

their income from taxation and deductibility by benefactors of the amounts of their donations. Nonprofit hospitals have never received these benefits as a favored general category, but an individual nonprofit hospital has been able to claim them if it could qualify as a corporation "organized and operated exclusively for . . . charitable . . . purposes" within the meaning of § 501 (c)(3) of the Code, 26 U. S. C. § 501 (c)(3).[1] As the Code does not define the term "charitable," the status of each nonprofit hospital is determined on a case-by-case basis by the IRS.

In recognition of the need of nonprofit hospitals for some guidelines on qualification as "charitable" corporations, the IRS in 1956 issued Revenue Ruling 56–185.[2] This Ruling established the position of the IRS to be "that the term 'charitable' in its legal sense and as it is used in section 501 (c)(3) of the Code contemplates an implied public trust constituted for some public benefit . . . ." In addition, the Ruling set out four "general requirements" that a hospital had to meet, "among other

---

[1] Section 501 is the linchpin of the statutory benefit system. Subsection (a) states that organizations described in subsection (c) "shall be exempt from taxation under this subtitle . . . ." Among the organizations described in current subsection (c)(3) are nonprofit corporations "organized and operated exclusively for religious, *charitable,* scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals." (Emphasis added.) Deduction by either an individual or a corporate taxpayer of a contribution to a nonprofit charitable corporation is allowed by §§ 170 (a), (c)(2). 26 U. S. C. §§ 170 (a), (c)(2). Other indirect benefits to such a corporation, similar in nature to the benefit it derives from third-party deductibility of contributions, are provided by various other sections of the Code. See 26 U. S. C. §§ 642 (c), 2055 (a)(2), 2106 (a)(2)(A) (ii), 2522 (a)(2) and (b)(2).

[2] 1956–1 Cum. Bull. 202.

things," to be considered a charitable organization by the IRS. Only one of those requirements is important here, and it reads as follows:

"It must be operated to the extent of its financial ability for those not able to pay for the services rendered and not exclusively for those who are able and expected to pay. It is normal for hospitals to charge those able to pay for services rendered in order to meet the operating expenses of the institution, without denying medical care or treatment to others unable to pay. The fact that its charity record is relatively low is not conclusive that a hospital is not operated for charitable purposes to the full extent of its financial ability. It may furnish services at reduced rates which are below cost, and thereby render charity in that manner. It may also set aside earnings which it uses for improvements and additions to hospital facilities. It must not, however, refuse to accept patients in need of hospital care who cannot pay for such services. Furthermore, if it operates with the expectation of full payment from all those to whom it renders services, it does not dispense charity merely because some of its patients fail to pay for the services rendered."

Revenue Ruling 56–185 remained the announced policy with respect to a nonprofit hospital's "charitable" status for 13 years, until the IRS issued Revenue Ruling 69–545 on November 3, 1969.[3] This new Ruling described two unidentified hospitals, referred to simply as Hospital A and Hospital B, which differed significantly in both

---

[3] 1969–2 Cum. Bull. 117. The substance of this Ruling had been issued as a policy pronouncement approximately one month earlier. Technical Info. Rel. 1022 (Oct. 8, 1969).

corporate structure and operating policies.[4]   The description of Hospital A included the following paragraph:

> "The hospital operates a full time emergency room and no one requiring emergency care is denied treatment.   The hospital otherwise ordinarily limits admissions to those who can pay the cost of their hospitalization, either themselves, or through private health insurance, or with the aid of public programs such as Medicare.   Patients who cannot meet the financial requirements for admission are ordinarily referred to another hospital in the community that does serve indigent patients."

Despite Hospital A's apparent failure to operate "to the extent of its financial ability for those not able to pay for the services rendered," as required by Revenue Ruling 56–185, the IRS in this new Ruling held Hospital A exempt as a charitable corporation under § 501 (c)(3).[5] Noting that Revenue Ruling 56–185 had set out require-

---

[4] The descriptions fit, in whole or in part, actual hospitals as to whose tax status either a taxpayer or an IRS field office had requested advice. The anonymous reference to the hospitals in Revenue Ruling 69–545 conformed to the IRS practice of deleting "identifying details and confidential information" contained in such requests, which are dealt with privately before the underlying fact situation is used in a published Revenue Ruling.   See 1969–2 Cum. Bull. xxii.

[5] In reaching this conclusion the IRS cited the law of trusts for the premise that promotion of health was a "charitable" purpose provided only that the class of direct beneficiaries was sufficiently large that its receipt of health services could be said to benefit the community as a whole.   See Restatement (Second) of Trusts §§ 368, 372 (1959); 4 A. Scott, Law of Trusts §§ 368, 372 (3d ed. 1967). The IRS then applied that premise to Hospital A and concluded that by maintaining an open emergency room and providing hospital care to all persons able to pay, either directly or through insurance, the hospital served a large enough class to qualify as charitable.

ments for serving indigents "more restrictive" than those applied to Hospital A, the IRS stated that "Revenue Ruling 56–185 is hereby modified to remove therefrom the requirements relating to caring for patients without charge or at rates below cost."

## II

Issuance of Revenue Ruling 69–545 led to the filing of this suit in July 1971 in the United States District Court for the District of Columbia, by a group of organizations and individuals. The plaintiff organizations described themselves as an unincorporated association [6] and several nonprofit corporations [7] each of which included low-income persons among its members and represented the interests of all such persons in obtaining hospital care and services. The 12 individual plaintiffs [8] described themselves as subsisting below the poverty income levels established by the Federal Government and suffering from medical conditions requiring hospital services. The organizations sued on behalf of their members, and each individual sued on his own behalf and as representative of all other persons similarly situated.

Each of the individuals described an occasion on which he or a member of his family had been disadvantaged in seeking needed hospital services because of indigency. Most involved the refusal of a hospital to admit the person because of his inability to pay a deposit or an advance fee, even though in some instances the

---

[6] California Welfare Rights Organization.

[7] Eastern Kentucky Welfare Rights Organization; National Tenants Organization; Association of Disabled Miners and Widows, Inc.; Health, Education, Advisory Team, Inc.

[8] One of the 12, a minor, sued by and through his parents, who also were named plaintiffs.

person was enrolled in the Medicare program. At least one plaintiff was denied emergency-room treatment because of his inability to pay immediately. And another was treated in the emergency room but then billed and threatened with suit although his indigency had been known at the time of treatment.

According to the complaint, each of the hospitals involved in these incidents had been determined by the Secretary and the Commissioner to be a tax-exempt charitable corporation, and each received substantial private contributions. The Secretary and the Commissioner were the only defendants. The complaint alleged that by extending tax benefits to such hospitals despite their refusals fully to serve the indigent, the defendants were "encouraging" the hospitals to deny services to the individual plaintiffs and to the members and clients of the plaintiff organizations. Those persons were alleged to be suffering "injury in their opportunity and ability to receive hospital services in nonprofit hospitals which receive . . . benefits . . . as 'charitable' organizations" under the Code. They also were alleged to be among the intended beneficiaries of the Code sections that grant favorable tax treatment to "charitable" organizations.

Plaintiffs made two principal claims. The first was that in issuing Revenue Ruling 69–545 the defendants had violated the Code, and that in granting charitable-corporation treatment to nonprofit hospitals that refused fully to serve indigents the defendants continued the violation. Their theory was that the legislative history of the Code, regulations of the IRS, and judicial precedent had established the term "charitable" in the Code to mean "relief of the poor," and that the challenged Ruling and current practice of the IRS departed from that interpretation. Plaintiffs' second claim was that the issuance of Revenue Ruling 69–545 without a

public hearing and an opportunity for submission of views had violated the rulemaking procedures of the APA, 5 U. S. C. § 553. The theory of this claim was that the Ruling should be considered a "substantive" rule as opposed to the "interpretative" type of rule that is exempted from the requirements of § 553.[9] Plaintiffs sought various forms of declaratory and injunctive relief.[10]

By a motion to dismiss, defendants challenged plaintiffs' standing, suggested the nonjusticiability of the subject matter of the suit, and asserted that in any event the action was barred by the Anti-Injunction Act,[11] the tax limitation in the Declaratory Judgment Act,[12] and the

[9] Section 553 (b) states that "[e]xcept when notice or hearing is required by statute, this subsection does not apply—(A) to interpretative rules . . . ."

Plaintiffs also claimed that issuance of Revenue Ruling 69–545 amounted to an abuse of discretion and denied them due process of law. These claims were treated summarily or not at all by the courts below, and plaintiffs have not pressed them in this Court.

[10] Plaintiffs requested judicial declarations that defendants had violated the Code and the APA, and that a hospital's charitable status required provision of full services to persons unable to pay and those on Medicaid. In addition, they sought to enjoin defendants to suspend charitable-organization treatment of, and to refrain from extending such treatment to, any hospital that failed to submit proof, on forms to be approved by the District Court, that it served indigents and those on Medicaid without either requiring advance deposits or attempting to collect, once service had been rendered. Plaintiffs also asked the District Court to order collection of all taxes "due and owing" because of the allegedly "illegal" extension of charitable status to hospitals that refused to serve indigents.

[11] "[N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U. S. C. § 7421 (a).

[12] "In a case of actual controversy within its jurisdiction, *except with respect to Federal taxes,* any court of the United States, upon the filing of an appropriate pleading, may declare the rights and

doctrine of sovereign immunity. The District Court denied this motion without opinion. On subsequent cross-motions for summary judgment the court considered but rejected each of defendants' arguments against its reaching the merits. The court then held that Revenue Ruling 69–545 was "improperly promulgated" and "without effect" insofar as it permitted nonprofit hospitals to qualify for tax treatment as charities without their offering "special financial consideration to persons unable to pay." 370 F. Supp. 325, 338 (1973).[13]

The Court of Appeals for the District of Columbia Circuit reversed. 165 U. S. App. D. C. 239, 506 F. 2d 1278 (1974). It agreed with the District Court's rejection of defendants' jurisdictional contentions, but held on the merits that Revenue Ruling 69–545 was founded upon a permissible definition of "charitable" and was not contrary to congressional intent in the Code. As to the plaintiffs' APA claim, which the District Court had not reached, the Court of Appeals held that Revenue Ruling 69–545 was an "interpretative" ruling and thus exempt from the APA's rulemaking requirements.

Plaintiffs sought a writ of certiorari in No. 74–1110 to review the Court of Appeals' judgment on the merits. Defendants filed a cross-petition in No. 74–1124 seeking review of that court's decision on the jurisdictional issues if plaintiffs' petition should be granted. We granted both petitions and consolidated them. 421

---

other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U. S. C. § 2201 (emphasis added).

[13] The court entered a declaratory judgment to that effect and enjoined defendants from extending tax-exempt status to a nonprofit hospital, or allowing deductions for contributions to it, until the hospital had satisfied the requirements of previous Revenue Ruling 56–185 regarding service to indigents and had posted in its public areas a court-approved notice reciting those requirements.

U. S. 975 (1975). Since we deal with defendants' contentions in No. 74–1124 first, and find it unnecessary to reach the issues raised by plaintiffs in No. 74–1110, we shall refer to defendants below as petitioners and to plaintiffs below as respondents.

## III

In this Court petitioners have argued that a policy of the IRS to tax or not to tax certain individuals or organizations, whether embodied in a Revenue Ruling or otherwise developed, cannot be challenged by third parties whose own tax liabilities are not affected. Their theory is that the entire history of this country's revenue system, including but not limited to the evolution of the Code, manifests a consistent congressional intent to vest exclusive authority for the administration of the tax laws in the Secretary and his duly authorized delegates, subject to oversight by the appropriate committees of Congress itself. It is argued that allowing third-party suits questioning the tax treatment accorded other taxpayers would transfer determination of general revenue policy away from those to whom Congress has entrusted it and vest it in the federal courts.[14]

---

[14] Petitioners rely in part upon this Court's decision in *Louisiana* v. *McAdoo*, 234 U. S. 627 (1914), as precedent for their position. In that case the State of Louisiana, as a producer of sugar, brought suit challenging the tariff rates applied by the Secretary of the Treasury to sugar imported from Cuba. This Court ordered the suit dismissed. Petitioners rely particularly upon statements in the opinion that maintenance of such actions "would operate to disturb the whole revenue system of the Government," and that "[i]nterference [by the courts] in such a case would be to interfere with the ordinary functions of government." *Id.*, at 632, 633. In view of our disposition, we express no opinion on the application of *McAdoo* to this kind of case.

In addition, petitioners analogize the discretion vested in the IRS with respect to administration of the tax laws to the discretion of a public prosecutor as to when and whom to prosecute. They thus invoke the settled doctrine that the exercise of prosecutorial discretion cannot be challenged by one who is himself neither prosecuted nor threatened with prosecution. See *Linda R. S.* v. *Richard D.*, 410 U. S. 614, 619 (1973). Petitioners also renew their jurisdictional contentions that this action is barred by the Anti-Injunction Act, the Declaratory Judgment Act, and the doctrine of sovereign immunity.

We do not reach either the question of whether a third party ever may challenge IRS treatment of another, or the question of whether there is a statutory or an immunity bar to this suit. We conclude that the District Court should have granted petitioners' motion to dismiss on the ground that respondents' complaint failed to establish their standing to sue.[15]

## IV

No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies. See *Flast* v. *Cohen*, 392 U. S. 83, 95 (1968). The concept of standing is part of this limitation. Unlike other associated doctrines, for example, that which restrains federal courts from deciding

---

[15] As noted, *supra*, at 34–35, the District Court considered petitioners' jurisdictional arguments, including their challenge to respondents' standing, when it ruled on cross-motions for summary judgment. The affidavits submitted by respondents merely supported the allegations of the complaint relative to establishing standing, rather than going beyond them. Thus, the standing analysis is no different, as a result of the case having proceeded to summary judgment, than it would have been at the pleading stage. Cf. *Warth* v. *Seldin*, 422 U. S. 490, 501–502 (1975).

political questions, standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Id.*, at 99. As we reiterated last Term, the standing question in its Art. III aspect "is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth* v. *Seldin*, 422 U. S. 490, 498–499 (1975) (emphasis in original). In sum, when a plaintiff's standing is brought into issue the relevant inquiry is whether, assuming justiciability of the claim, the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision. Absent such a showing, exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation.[16]

Respondents brought this action under § 10 of the APA, 5 U. S. C. § 702, which gives a right to judicial review to any person "adversely affected or aggrieved by agency action within the meaning of a relevant statute." [17] In *Data Processing Service* v. *Camp*, 397 U. S. 150 (1969), this Court held the constitutional standing requirement under this section to be allegations which, if true, would establish that the plaintiff had been injured in fact by

---

[16] This Court often has noted that the focus upon the plaintiff's stake in the outcome of the issue he seeks to have adjudicated serves a separate and equally important function bearing upon the nature of the judicial process. As stated in *Baker* v. *Carr*, 369 U. S. 186, 204 (1962), a significant personal stake serves "to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions."

[17] "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U. S. C. § 702.

the action he sought to have reviewed. Reduction of the threshold requirement to actual injury redressable by the court represented a substantial broadening of access to the federal courts over that previously thought to be the constitutional minimum under this statute.[18]  But, as this Court emphasized in *Sierra Club* v. *Morton,* 405 U. S. 727, 738 (1972), "broadening the categories of injury that may be alleged in support of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury." See also *United States* v. *Richardson,* 418 U. S. 166, 194 (1974) (POWELL, J., concurring). The necessity that the plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an Art. III requirement. A federal court cannot ignore this requirement without overstepping its assigned role in our system of adjudicating only actual cases and controversies.[19] It is according to this settled principle that the allegations of both the individual respondents and the respondent organizations must be tested for sufficiency.

## A

We note at the outset that the five respondent organizations, which described themselves as dedicated to

[18] The previous view can be found in *Kansas City Power & Light Co.* v. *McKay,* 96 U. S. App. D. C. 273, 281, 225 F. 2d 924, 932 (1955). See *Sierra Club* v. *Morton,* 405 U. S. 727, 733 (1972).

[19] The *Data Processing* decision established a second, nonconstitutional standing requirement that the interest of the plaintiff, regardless of its nature in the absolute, at least be "arguably within the zone of interests to be protected or regulated" by the statutory framework within which his claim arises. See 397 U. S., at 153. As noted earlier, respondents in this case claim that they, and of course their particular interests involved in this suit, are the intended beneficiaries of the charitable organization provisions of the Code. In view of our disposition of this case, we need not consider this "zone of interests" test.

40

promoting access of the poor to health services, could not establish their standing simply on the basis of that goal. Our decisions make clear that an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III. *Sierra Club* v. *Morton, supra;* see *Warth* v. *Seldin, supra.* Insofar as these organizations seek standing based on their special interest in the health problems of the poor their complaint must fail. Since they allege no injury to themselves as organizations, and indeed could not in the context of this suit, they can establish standing only as representatives of those of their members who have been injured in fact, and thus could have brought suit in their own right. *Warth* v. *Seldin, supra,* at 511. The standing question in this suit therefore turns upon whether any individual respondent has established an actual injury,[20] or whether the respondent organizations have established actual injury to any of their indigent members.

### B

The obvious interest of all respondents, to which they claim actual injury, is that of access to hospital services. In one sense, of course, they have suffered injury to that interest. The complaint alleges specific occasions on which each of the individual respondents sought but was denied hospital services solely due to his indigency,[21] and

---

[20] The individual respondents sought to maintain this suit as a class action on behalf of all persons similarly situated. That a suit may be a class action, however, adds nothing to the question of standing, for even named plaintiffs who represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth* v. *Seldin,* 422 U. S., at 502.

[21] One of the individual respondents complains, not that he was

in at least some of the cases it is clear that the needed treatment was unavailable, as a practical matter, anywhere else. The complaint also alleges that members of the respondent organizations need hospital services but live in communities in which the private hospitals do not serve indigents. We thus assume, for purpose of analysis, that some members have been denied service. But injury at the hands of a hospital is insufficient by itself to establish a case or controversy in the context of this suit, for no hospital is a defendant. The only defendants are officials of the Department of the Treasury, and the only claims of illegal action respondents desire the courts to adjudicate are charged to those officials. "Although the law of standing has been greatly changed in [recent] years, we have steadfastly adhered to the requirement that, at least in the absence of a statute expressly conferring standing, federal plaintiffs must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction." *Linda R. S.* v. *Richard D.*, 410 U. S., at 617.[22] In other words, the "case or controversy" limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury

denied service, but that he was treated and then billed despite the hospital's knowledge of his indigency. This variation of the injury does not change the standing analysis.

[22] The reference in *Linda R. S.* to "a statute expressly conferring standing" was in recognition of Congress' power to create new interests the invasion of which will confer standing. See 410 U. S., at 617 n. 3; *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205 (1972). When Congress has so acted, the requirements of Art. III remain: "[T]he plaintiff still must allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants." *Warth* v. *Seldin, supra*, at 501. See also *United States* v. *SCRAP*, 412 U. S. 669 (1973); cf. *Sierra Club* v. *Morton, supra*, at 732 n. 3.

42

that results from the independent action of some third party not before the court.

The complaint here alleged only that petitioners, by the adoption of Revenue Ruling 69–545, had "encouraged" hospitals to deny services to indigents.[23] The implicit corollary of this allegation is that a grant of respondents' requested relief, resulting in a requirement that all hospitals serve indigents as a condition to favorable tax treatment, would "discourage" hospitals from denying their services to respondents. But it does not follow from the allegation and its corollary that the denial of access to hospital services in fact results from petitioners' new Ruling, or that a court-ordered return by petitioners to their previous policy would result in these respondents' receiving the hospital services they desire. It is purely speculative whether the denials of service

---

[23] The Court of Appeals, in sustaining Revenue Ruling 69–545 on the merits, relied in part upon its conclusion that the new IRS policy, which apparently requires a hospital to provide free *emergency* care to indigents, may result in as much or more relief to the poor than the policy of the previous Ruling. Much of respondents' argument, and that of several of the *amici,* have been directed against that conclusion. As we do not reach the merits, we need not consider this question. But we accept for purposes of the standing inquiry respondents' averment that the IRS's new policy encourages a hospital to provide fewer services to indigents than it might have under the previous policy.

We do note, however, that it is entirely speculative whether even the earlier Ruling would have assured the medical care they desire. It required a hospital to provide care for the indigent only "to the extent of its financial ability," and stated that a low charity record was not conclusive that a hospital had failed to meet that duty. See *supra,* at 30. Thus, a hospital could not maintain, consistently with Revenue Ruling 56–185, a general policy of refusing care to all patients unable to pay. But the number of such patients accepted, and whether any particular applicant would be admitted, would depend upon the financial ability of the hospital to which admittance was sought.

specified in the complaint fairly can be traced to petitioners' "encouragement" or instead result from decisions made by the hospitals without regard to the tax implications.

It is equally speculative whether the desired exercise of the court's remedial powers in this suit would result in the availability to respondents of such services. So far as the complaint sheds light, it is just as plausible that the hospitals to which respondents may apply for service would elect to forgo favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services. It is true that the individual respondents have alleged, upon information and belief, that the hospitals that denied them service receive substantial donations deductible by the donors. This allegation could support an inference that these hospitals, or some of them, are so financially dependent upon the favorable tax treatment afforded charitable organizations that they would admit respondents if a court required such admission as a condition to receipt of that treatment. But this inference is speculative at best.[24] The Solicitor General states in his brief that, nationwide, private philanthropy accounts for only 4% of private hospital revenues. Respondents introduced in the District Court a statement to Congress by an official of a hospital association describing the importance to nonprofit hospitals of the favorable tax treatment they receive as charitable corporations. Such conflicting evidence supports the commonsense proposition that the dependence upon special tax benefits may vary from hospital to hospital. Thus, respondents' allegation that

---

[24] The complaint reveals nothing at all about the dependence upon charitable contributions of any hospitals that might have denied services to members of respondent organizations. See *supra*, at 40–41.

certain hospitals receive substantial charitable contributions, without more, does not establish the further proposition that those hospitals are dependent upon such contributions.

Prior decisions of this Court establish that unadorned speculation will not suffice to invoke the federal judicial power. In *Linda R. S.* v. *Richard D.*, the mother of an illegitimate child averred that state-court interpretation of a criminal child support statute as applying only to fathers of legitimate children violated the Equal Protection Clause of the Fourteenth Amendment. She sought an injunction requiring the district attorney to enforce the statute against the father of her child. We held that the mother lacked standing, because she had "made no showing that her failure to secure support payments results from the nonenforcement, as to her child's father, of [the statute]." 410 U. S., at 618. The prospect that the requested prosecution in fact would result in the payment of child support—instead of jailing the father—was "only speculative." *Ibid.* Similarly, last Term in *Warth* v. *Seldin* we held that low-income persons seeking the invalidation of a town's restrictive zoning ordinance lacked standing because they had failed to show that the alleged injury, inability to obtain adequate housing within their means, was fairly attributable to the challenged ordinance instead of to other factors. In language directly applicable to this litigation, we there noted that plaintiffs relied "on little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had [defendants] acted otherwise, and might improve were the court to afford relief." 422 U. S., at 507.

The principle of *Linda R. S.* and *Warth* controls this case. As stated in *Warth*, that principle is that indirectness of injury, while not necessarily fatal to standing,

"may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." 422 U. S., at 505. Respondents have failed to carry this burden. Speculative inferences are necessary to connect their injury to the challenged actions of petitioners.[25] Moreover, the complaint suggests no substantial likelihood that victory in this suit would result

---

[25] The courts below erroneously believed that *United States* v. *SCRAP* supported respondents' standing. In *SCRAP,* although the injury was indirect and "the Court was asked to follow [an] attenuated line of causation," 412 U. S., at 688, the complaint nevertheless "alleged a specific and perceptible harm" flowing from the agency action. *Id.,* at 689. Such a complaint withstood a motion to dismiss, although it might not have survived challenge on a motion for summary judgment. *Id.,* at 689, and n. 15. But in this case the complaint is insufficient even to survive a motion to dismiss, for it fails to allege an injury that fairly can be traced to petitioners' challenged action. See *supra,* at 40–43. Nor did the affidavits before the District Court at the summary judgment stage supply the missing link.

Our decision is also consistent with *Data Processing Service* v. *Camp,* 397 U. S. 150 (1969). The Court there stated: "The first question is whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise." *Id.,* at 152. The complaint in *Data Processing* alleged injury that was directly traceable to the action of the defendant federal official, for it complained of injurious competition that would have been illegal without that action. Accord, *Arnold Tours, Inc.* v. *Camp,* 400 U. S. 45 (1970); *Investment Co. Institute* v. *Camp,* 401 U. S. 617, 620–621 (1971). Similarly, the complaint in *Data Processing*'s companion case of *Barlow* v. *Collins,* 397 U. S. 159 (1970), was sufficient because it alleged extortionate demands by plaintiffs' landlord made possible only by the challenged action of the defendant federal official. See *id.,* at 162–163. In the instant case respondents' injuries might have occurred even in the absence of the IRS Ruling that they challenge; whether the injuries fairly can be traced to that Ruling depends upon unalleged and unknown facts about the relevant hospitals.

in respondents' receiving the hospital treatment they desire. A federal court, properly cognizant of the Art. III limitation upon its jurisdiction, must require more than respondents have shown before proceeding to the merits.

Accordingly, the judgment of the Court of Appeals is vacated, and the cause is remanded to the District Court with instructions to dismiss the complaint.

*It is so ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of these cases.

MR. JUSTICE STEWART, concurring.

I join the opinion of the Court holding that the plaintiffs in this case did not have standing to sue. I add only that I cannot now imagine a case, at least outside the First Amendment area, where a person whose own tax liability was not affected ever could have standing to litigate the federal tax liability of someone else.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, concurring in the judgment.

I agree that in this litigation as it is presently postured, respondents (herein used to refer to plaintiffs below) have not met their burden of establishing a concrete and reviewable controversy betwen themselves and the Government with respect to the disputed Revenue Ruling. That is, however, the full extent of my agreement with the Court in this case. I must dissent from the Court's reasoning on the standing issue, reasoning that is unjustifiable under any proper theory of standing and clearly contrary to the relevant precedents. The Court's further obfuscation of the law of standing is particularly unnecessary when there are obvious and reasonable alternative grounds upon which to decide this litigation.

# I

Respondents brought this action for declaratory and injunctive relief, seeking, *inter alia,* a declaration that Revenue Ruling 69–545 is inconsistent with the relevant provisions of the Internal Revenue Code and promulgated in violation of the rulemaking provisions of the Administrative Procedure Act, 5 U. S. C. § 553. Respondents claimed to be indigents, to be in need of free or below-cost medical care provided by private, nonprofit hospitals accorded tax-exempt status under the Internal Revenue Code, and to be protected by and beneficiaries of the provisions of the Code providing for tax-exempt status for nonprofit organizations engaging in "charitable" activities. Respondents alleged that they had in specified instances been denied provision of free or below-cost medical services by nonprofit hospitals accorded tax-exempt status under the Code, and that by issuing the disputed Revenue Ruling the Internal Revenue Service was "encouraging" tax-exempt hospitals to deny them such services. Accordingly, respondents alleged, the IRS was injuring them in their "opportunity and ability" to receive medical services and doing so illegally, in derogation of the results intended by the "charitable" provisions of the Code.

However, as noted by the Court, the disputed Ruling on its face applies only to a narrow category of nonprofit hospitals—those fairly characterized by the factual and legal circumstances described in the Ruling as pertaining to "Hospital A." The Ruling does not indicate what treatment will be accorded hospitals not within the situation described in the hypothesis.[1] The most hotly

---

[1] Revenue Ruling 69–545, 1969–2 Cum. Bull. 117, provides in pertinent part:

"Advice has been requested whether the two nonprofit hospitals described below qualify for exemption from Federal income tax

contested portion of the disputed ruling, that modifying the earlier Revenue Ruling 56–185 by "remov[ing] therefrom the requirements relating to caring for pa-

under section 501 (c) (3) of the Internal Revenue Code of 1954 . . . .

"*Situation 1.* Hospital *A* is a 250-bed community hospital. Its board of trustees is composed of prominent citizens in the community. Medical staff privileges in the hospital are available to all qualified physicians in the area, consistent with the size and nature of its facilities. The hospital has 150 doctors on its active staff and 200 doctors on its courtesy staff. It also owns a medical office building on its premises with space for 60 doctors. Any member of its active medical staff has the privilege of leasing available office space. Rents are set at rates comparable to those of other commercial buildings in the area.

"The hospital operates a full time emergency room and no one requiring emergency care is denied treatment. The hospital otherwise ordinarily limits admissions to those who can pay the cost of their hospitalization, either themselves, or through private health insurance, or with the aid of public programs such as Medicare. Patients who cannot meet the financial requirements for admission are ordinarily referred to another hospital in the community that does serve indigent patients.

"The hospital usually ends each year with an excess of operating receipts over operating disbursements from its hospital operations. Excess funds are generally applied to expansion and replacement of existing facilities and equipment, amortization of indebtedness, improvement in patient care, and medical training, education, and research.

. . . . .

"To qualify for exemption from Federal income tax under section 501 (c) (3) of the Code, a nonprofit hospital must be organized and operated exclusively in furtherance of some purpose considered 'charitable' in the generally accepted legal sense of that term, and the hospital may not be operated, directly or indirectly, for the benefit of private interests.

"In the general law of charity, the promotion of health is considered to be a charitable purpose. *Restatement (Second), Trusts,* sec. 368 and sec. 372; IV *Scott on Trusts* (3rd ed. 1967), sec. 368 and sec. 372. A nonprofit organization whose purpose and activity are providing hospital care is promoting health and may, therefore, qualify as organized and operated in furtherance of a charitable

tients without charge or at rates below cost," is at best
ambiguous regarding its application or effect respecting
nonprofit hospitals not within the factual and legal situa-

purpose. If it meets the other requirements of section 501 (c)(3)
of the Code, it will qualify for exemption from Federal income tax
under section 501 (a).

"Since the purpose and activity of Hospital A, apart from its
related educational and research activities and purposes, are pro-
viding hospital care on a nonprofit basis for members of its commu-
nity, it is organized and operated in furtherance of a purpose
considered 'charitable' in the generally accepted legal sense of that
term. The promotion of health, like the relief of poverty and the
advancement of education and religion, is one of the purposes in the
general law of charity that is deemed beneficial to the community as
a whole even though the class of beneficiaries eligible to receive a
direct benefit from its activities does not include all members of
the community, such as indigent members of the community, pro-
vided that the class is not so small that its relief is not of benefit
to the community. *Restatement (Second), Trusts*, sec. 368, com-
ment (b) and sec. 372, comments (b) and (c); IV *Scott on Trusts*
(3rd ed. 1967), sec. 368 and sec. 372.2. By operating an emergency
room open to all persons and by providing hospital care for all
those persons in the community able to pay the cost thereof either
directly or through third party reimbursement, Hospital A is pro-
moting the health of a class of persons that is broad enough to
benefit the community.

"The fact that Hospital A operates at an annual surplus of
receipts over disbursements does not preclude its exemptions. By
using its surplus funds to improve the quality of patient care, ex-
pand its facilities, and advance its medical training, education,
and research programs, the hospital is operating in furtherance
of its exempt purposes.

.          .          .          .          .

"Accordingly, it is held that Hospital A is exempt from Federal
income tax under section 501 (c)(3) of the Code.

.          .          .          .          .

"Even though an organization considers itself within the scope of
*Situation* 1 of this Revenue Ruling, it must file an application on
Form 1023, Exemption Application, in order to be recognized by
the Service as exempt under section 501 (c)(3) of the Code.

"Revenue Ruling 56-185, C.B. 1956-1, 202 sets forth requirements

tion of Hospital A. Accordingly, there is simply no ripe controversy with respect to a claim that the disputed ruling illegally "encourages" *all* nonprofit hospitals to withdraw the provision of indigent services by removing from *all* hospitals the requirement of such services as a prerequisite to tax-exempt status.

This was the position of the Secretary of the Treasury and the Commissioner of Internal Revenue with respect to the disputed Ruling at oral argument,[2] and no repre-

---

for exemption of hospitals under section 501 (c)(3) more restrictive than those contained in this Revenue Ruling with respect to caring for patients without charge or at rates below cost. . . .

"Revenue Ruling 56–185 is hereby modified to remove therefrom the requirements relating to caring for patients without charge or at rates below cost."

[2] *E. g.,* "Now, this ruling itself demonstrates the hypothetical quality of what the plaintiffs are seeking, the hypothetical quality of the relief they are seeking, because as the Court can readily see in [perusing] this Revenue Ruling, it sets forth two polar situations, situation 1 and situation 2, dealing with two hospitals, Hospital A and Hospital B. In Hospital A, there are a variety of facts in connection with Hospital A, it has an open board of trustees, it gives open staff privileges, it is involved in research and educational activities, it maintains a full-time emergency room, and no one requiring emergency care is denied treatment. To the contrary, [H]ospital B is almost proprietary in nature, it's owned by a small group of doctors, they limit the staff privileges to people they know, and they comprise the medical committee generally to keep out qualified physicians, et cetera, et cetera, and it maintains an emergency room, but basically to treat the patients of its own doctors.

"Now, these two polar examples were designed to educate the public generally and hospital administrators as to clear-cut situations. Hospital A is a situation, if you are like Hospital A, you will be fairly certain of exemption, but, of course, the ruling does conclude that you can't be certain of that itself. You have got to yourself submit an application for exemption to the Internal Revenue Service.

"If you are like [H]ospital B, which is a polar example of a hospital that doesn't seem to provide any community benefit, it seems to be

sentation to the contrary appears in the record. Moreover, no facts were alleged or introduced in the District Court that any way indicated with more specificity that the disputed Ruling had or was intended to have application to all nonprofit hospitals. Respondents apparently made no attempt to clarify the meaning of the Ruling in this regard, as, for example, by filing with the IRS a petition for clarification of the Ruling pursuant to the Administrative Procedure Act, 5 U. S. C. § 555 (e), see, e. g., *Dunlop* v. *Bachowski,* 421 U. S. 560, 573 (1975), or by petitioning for a revision of the Ruling pursuant to that Act, 5 U. S. C. § 553 (e), cf. *Oljato Chapter of Navajo Tribe* v. *Train,* 169 U. S. App. D. C. 195, 207, 515 F. 2d 654, 666–667 (1975), or by seeking clarification by means of discovery or an informal request. Accordingly, with respect to any claim that the Ruling illegally withdraws the requirement of the provision of indigent services from all hospitals seeking tax-exempt status under the "charitable" provisions of the Code, a "lack of ripeness inhere[s] in the fact that the need for some further procedure, some further contingency of ap-

---

run pretty much strictly for the private inurement of its owner-doctors. In that situation you are not going to get a tax-exempt status.

"Now, the important thing which we emphasize is that the ruling doesn't even begin to attempt to deal with the hundreds of gradations in between Hospital A and Hospital B. Hospital A, assuming for a moment that it doesn't give free care to indigents on a broad scale, let's say it dropped its emergency room completely for, let's say, the particular example that it might be engaged in treating cancer patients or a particular kind of disease. Under those circumstances an emergency room would be superfluous because such a hospital would rarely have need for an emergency room. Or, for example, a consortium of hospitals in a particular community could get together and one could say, 'We will have the emergency room, you have the nursing school, and a third—' " Tr. of Oral Arg. 23–25.

plication or interpretation . . . serve[s] to make remote the issue which was sought to be presented to the Court." *Poe* v. *Ullman,* 367 U. S. 497, 528 (1961) (Harlan, J., dissenting). Cf. *Toilet Goods Assn.* v. *Gardner,* 387 U. S. 158, 163–164 (1967).[3] "It is clear beyond question . . . that [the disputed Ruling] on [its] face raise[s] questions which should not be adjudicated in the abstract and in the general, but which require a 'concrete setting' for determination." *Gardner* v. *Toilet Goods Assn.,* 387 U. S. 167, 197 (1967) (opinion of Fortas, J.).

Further, if respondents wished to challenge the legality of the Ruling in respect to the unambiguous aspects of its application—its application to hospitals fairly coming within the situation described as pertaining to Hospital A—it was incumbent upon them to allege, and, at the appropriate stage of the litigation, to offer evidence to show that the hospitals whose conduct affected them were hospitals whose operations could fairly be characterized as implicated by the terms of the Ruling. Such allegations and showings were necessary to demonstrate some logical connection or nexus between the wrongful action alleged, the issuance of the disputed Ruling, and the harm of which respondents complain, injury to their "opportunity and ability" to secure medical services. This is required, of course, by the only constitutional, "case or controversy," policy affecting the law of standing—to ensure that the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the [C]ourt so largely

---

[3] Of course, the ripeness determination has as an integral component the question of whether the agency action is sufficiently "final" for judicial review within the meaning of the Administrative Procedure Act, 5 U. S. C. § 704. See *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 149 (1967).

depends for illumination of difficult . . . questions."
*Baker* v. *Carr,* 369 U. S. 186, 204 (1962).

The allegations of the complaint are probably sufficient to state this claim with respect to certain of the respondents.[4] In any event, however, the petitioners (used herein to refer to defendants below) later moved for summary judgment on the standing issue, specifically arguing that "[t]he plaintiffs have failed to demonstrate that the alleged injuries complained of herein were incurred as a result of any actions on the part of the defendants." App. 154. At this point in the litigation, it was clearly incumbent upon the respondents to make a showing sufficient to create a material issue of fact whether there was any connection between the hospitals affecting them and the Ruling alleged to be illegally "encouraging" tax-exempt hospitals to withdraw the provision of indigents' services, thereby injuring respondents' "opportunity and ability" for such services.

---

[4] With respect to certain of the respondents, the allegations of the complaint would seem to controvert a connection between the hospitals whose past conduct affected them and the disputed Revenue Ruling. For example, certain of the respondents alleged they were enrolled in the Medicaid program, but were denied treatment in the absence of a further cash deposit by the hospitals to which they applied for admission. This would appear to refute an inference that the hospitals involved came within the terms of the disputed Ruling and were granted tax-exempt status on that basis. No further allegations or, at summary judgment, showings were made to clarify this aspect of the case.

In fairness to respondents, it is noted that the wrongs alleged in the complaint and the relief sought went beyond simply challenging the disputed Ruling; respondents further sought to declare illegal and enjoin the IRS from granting tax-exempt status to hospitals whose operations, apart from the disputed Ruling, did not properly fall within the definition of "charitable" as required by the Internal Revenue Code. However, only issues concerning the disputed Revenue Ruling are before us on the petition for certiorari.

See *Barlow* v. *Collins*, 397 U. S. 159, 175, and n. 10 (1970) (opinion of BRENNAN, J.).[5] No such showing was made. There is absolutely no indication in the record that the contested Ruling altered the operation of these hospitals in any way, or that the tax-exempt status of these hospitals was in any way related to the Ruling. Accordingly, the petitioners were entitled to judgment in their favor on their motion for summary judgment.

## II

The Court today, however, wholly ignores the foregoing aspects of this case. Rather, it assumes that the governmental action complained of *is* encouraging the hospitals affecting respondents to provide fewer medical services to indigents. *Ante,* at 42, and n. 23. This is done in order to make the gratuitous and erroneous point that respondents, as a prerequisite to pursuing any legal claims regarding the Revenue Ruling, must allege and later prove that the hospitals affecting re-

---

[5] Such a showing was required to demonstrate standing in respect to respondents' claim that the Revenue Ruling was promulgated in violation of the rulemaking provisions of the Administrative Procedure Act as well as for purposes of their other claims. It is true that the rulemaking section of the Act provides for notice and opportunity to comment for "interested persons," 5 U. S. C. § 553 (c). However, it is unnecessary to decide in this case whether Congress by so providing has created a cognizable interest in such participation and standing to complain of its wrongful deprivation apart from any other injury in fact flowing from the agency action. Cf. *Trafficante* v. *Metropolitan Life Ins. Co.,* 409 U. S. 205 (1972). Respondents in this litigation made no allegation or showing that they desired an opportunity to participate, or that they would have availed themselves of such an opportunity had it been presented. Therefore, in regard to this procedural claim no less than the other claims raised, respondents were required to demonstrate some connection between the disputed Ruling and the hospitals affecting them in order to make out some injury in fact resulting from the challenged action.

spondents "are dependent upon" their tax-exempt status, *ante,* at 44, that they would not in the absence of the Ruling's assumed "encouragement" "elect to forgo favorable tax treatment," and that the absence of the allegedly illegal inducement would "result in the availability to respondents of such services," *ante,* at 43. In reaching this conclusion, the Court abjures analysis either of the Art. III policies heretofore assumed to inhere in the constitutional dimension of the standing doctrine, or of the relevant precedents of this Court.[6]

## A

First, the Court's treatment of the injury-in-fact standing requirement is simply unsupportable in the context of this case. The wrong of which respondents complain is that the disputed Ruling gives erroneous economic signals to nonprofit hospitals whose subsequent responses affect respondents; they claim the IRS is offering the economic inducement of tax-exempt status to such hospitals under terms illegal under the Internal

---

[6] Moreover, by requiring that this " 'line of causation,' " *ante,* at 45 n. 25, be precisely and intricately elaborated in the complaint, the Court continues its recent policy of "reverting to the form of fact pleading long abjured in the federal courts." *Warth* v. *Seldin,* 422 U. S. 490, 528 (1975) (BRENNAN, J., dissenting). One waits in vain for an explanation for this selectively imposed pleading requirement; a requirement so at odds with our usual view that under the Federal Rules of Civil Procedure "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley* v. *Gibson,* 355 U. S. 41, 45–46 (1957). The want of an explanation is even more striking when considered in light of our reaffirmation of *Conley* only this Term, *Hospital Bldg. Co.* v. *Trustees of Rex Hospital,* 425 U. S. 738, 746 (1976), and our observation therein that the same standard is applicable to testing the sufficiency of the complaint for subject-matter jurisdiction, *id.,* at 742 n. 1.

Revenue Code. Respondents' claim is not, and by its very nature could not be, that they have been and will be illegally denied the provision of indigent medical services by the hospitals. Rather, if respondents have a claim cognizable under the law, it is that the Internal Revenue Code requires the Government to offer economic inducements to the relevant hospitals only under conditions which are likely to benefit respondents. The relevant injury in light of this claim is, then, injury to this beneficial interest—as respondents alleged, injury to their "opportunity and ability" to receive medical services. Respondents sufficiently alleged this injury and if, as the Court so readily assumes, they had made a showing sufficient to create an issue of material fact that the Government was injuring this interest, they would continue to possess standing to press the claim on the merits.

Clearly such conditions if met would provide the essence of the only constitutionally mandated element of standing—a personal stake sufficient to create concrete adverseness meeting minimal conditions for Art. III justiciability. *Baker* v. *Carr,* 369 U. S., at 204; *Barlow* v. *Collins, supra,* at 164. See also *United States* v. *Richardson,* 418 U. S. 166, 196 n. 18 (1974) (POWELL, J., concurring). Nothing in the logic or policy of constitutionally required standing is added by the further injury-in-fact dimension required by the Court today— that respondents allege that the hospitals affecting them would not have elected to forgo the favorable tax treatment and that this would "result in the availability to respondents of" free or below-cost medical services.

Furthermore, the injury of which respondents complain is of a continuing and continuous nature, and the additional allegations and showings that the Court requires would not be determinative of the hospitals' future conduct. Even if a given hospital affecting respondents had in the past made its determination regarding indi-

gent services without regard to the tax consequences of that determination—would have elected to forgo favorable tax treatment in the absence of the allegedly illegal "encouragement"—such a choice presumably would be subject to continuous re-evaluation in the future, as the hospital's circumstances, the economic climate, and expectations regarding donor contributions changed over time. Respondents complain of and seek relief from the threat of future policy determinations by the hospitals based on the allegedly illegal tax Ruling, not redress for past "encouragement." We have often found standing in plaintiffs to complain of such future harm irrespective of any showing of the realization of such threatened injuries in the past. *E. g., Doe* v. *Bolton,* 410 U. S. 179, 188 (1973); *Epperson* v. *Arkansas,* 393 U. S. 97, 101–102 (1968).

Indeed, to the extent that there is Art. III substance to the concerns addressed by the Court today, it is not a question of *standing*—of identifying the proper party to bring the action—but rather whether the threat of the more ultimate future harm is of sufficient immediacy to meet the minimum requirements of Art. III justiciability. The task is one of distinguishing between a "justiciable controversy" and a "difference or dispute of a hypothetical or abstract character," *Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227, 240 (1937), and the question is "necessarily one of degree." *Maryland Cas. Co.* v. *Pacific Coal & Oil Co.,* 312 U. S. 270, 273 (1941); *Golden* v. *Zwickler,* 394 U. S. 103, 108 (1969).

> "[I]t would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality

to warrant the issuance of a declaratory judgment."
*Ibid.*

If, as the Court assumes, respondents had demonstrated
that the disputed Ruling had application to the hospitals
affecting them, I would have no doubt that this standard
had been met. In such a case I would readily conclude:

> "[T]he challenged governmental activity . . . is not
> contingent, . . . and, by its continuing and brooding
> presence, casts what may well be a substantial ad-
> verse effect on the interests of the [responding]
> parties.
>
> .        .        .        .        .
>
> "Where such state action or its imminence ad-
> versely affects the status of private parties, the
> courts should be available to render appropriate
> relief and judgments affecting the parties' rights
> and interests." *Super Tire Engineering Co.* v. *Mc-*
> *Corkle,* 416 U. S. 115, 122, 125 (1974).

### B

Second, the Court's treatment of the injury-in-fact
requirement directly conflicts with past decisions. Re-
spondents brought this action seeking general statutory
review of administrative action under the provisions of
the Administrative Procedure Act. Hence, the govern-
ing precedents respecting standing are those developed
in *Data Processing Service* v. *Camp,* 397 U. S. 150 (1970);
*Barlow* v. *Collins,* 397 U. S. 159 (1970); *Sierra Club* v.
*Morton,* 405 U. S. 727 (1972); and *United States* v.
*SCRAP,* 412 U. S. 669 (1973). See also *Hardin* v. *Ken-*
*tucky Utilities Co.,* 390 U. S. 1 (1968). Any prudential,
nonconstitutional considerations that underlay the
Court's disposition of the injury-in-fact standing require-
ment in cases such as *Linda R. S.* v. *Richard D.,* 410

U. S. 614 (1973),[7] and *Warth* v. *Seldin,* 422 U. S. 490 (1975), are simply inapposite when review is sought under a congressionally enacted statute conferring standing and providing for judicial review.[8] In such a case considerations respecting "the allocation of power at the national level [and] a shift away from a democratic form of government," *United States* v. *Richardson,* 418 U. S., at 188 (POWELL, J., concurring), are largely ameliorated, and such prudential limitations as remain are supposedly

---

[7] We were originally told in *Linda R. S.* v. *Richard D.,* 410 U. S., at 617, 619, that the treatment of the injury-in-fact standing requirement, and the consequent dismissal of the case owing to the lack of a "direct nexus" between the injury incurred and the wrongful action alleged, was a consequence of the "unique context of a challenge to a criminal statute," and the "special status of criminal prosecutions in our system." Although. this conclusion was arguable even in its specific context, see *id.,* at 621 (WHITE, J., dissenting), last Term's *Warth* v. *Seldin,* 422 U. S. 490 (1975), taught that the raising of the threshold requirement for pleading injury in fact in *Linda R. S.* was not "unique" after all. But whatever the merits of the treatment of the injury-in-fact requirement in those cases, it is distressing that the Court should mechanically apply the approach developed therein to a case brought under the Administrative Procedure Act without any analysis, see *ante,* at 37–39, and n. 16, of the only *constitutional* dimension of standing—the requirement of concrete adverseness flowing from a personal stake in the outcome. See *United States* v. *Richardson,* 418 U. S. 166, 181 (1974) (POWELL, J., concurring).

[8] The Court has read the standing provision of the Administrative Procedure Act, 5 U. S. C. § 702, which provides for review for any "person . . . adversely affected or aggrieved by agency action within the meaning of a relevant statute," as conferring standing upon any person whose interest is adversely affected in fact, so long as that interest comes within the purposes and policies of the statute or statutes authorizing the agency action in question ("within the meaning of a relevant statute"). See *Sierra Club* v. *Morton,* 405 U. S., at 732–733; Albert, Standing to Challenge Administrative Action: An Inadequate Surrogate for Claim for Relief, 83 Yale L. J. 425, 451–452, n. 105 (1974).

subsumed under the "zone of interests" test developed in *Data Processing Service* v. *Camp, supra.*[9] See *United States* v. *Richardson, supra,* at 196 n. 18 (POWELL, J., concurring).

Our previous decisions concerning standing to sue under the Administrative Procedure Act conclusively show that the injury in fact demanded is the constitutional minimum identified in *Baker* v. *Carr,* 369 U. S., at 204—the allegation of such a "personal stake in the outcome of the controversy as to assure" concrete adverseness. *Sierra Club* v. *Morton, supra,* at 732–733; *Data Processing Service* v. *Camp, supra,* at 151–152. True, the Court has required that the person seeking review allege that he personally has suffered or will suffer the injury sought to be avoided, *Sierra Club, supra,* at 740. But there can be no doubt that respondents here, by demonstrating a connection between the disputed Ruling and the hospitals affecting them, could have adequately served the policy implicated by the pleading requirement of *Sierra Club*—putting "the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome." *Ibid.* In such a case respondents would not be attempting merely to "vindicate their own value preferences through the judicial process." *Ibid.* See Albert, *supra,* n. 8, at 485–489. If such a showing were made, a real and recognizable harm to tangible interest would have been alleged, indeed more so than we have required in other circumstances. *United States* v. *SCRAP, supra; Sierra Club* v. *Morton, supra;*

---

[9] It is my view, however, that such considerations go only to other questions of justiciability or to questions of the reviewability of the administrative action, and not properly to the question of standing. *Barlow* v. *Collins,* 397 U. S., at 168–170, 171 n. 3, 173–175 (opinion of BRENNAN, J.).

cf. *Barlow* v. *Collins, supra,* at 163.[10]   Moreover, the injury alleged would be a " 'distinctive or discriminating' . . . harm," *id.,* at 172 n. 5 (opinion of BRENNAN, J.), clearly a "particularized injury [setting respondents] apart from the man on the street." *United States* v. *Richardson, supra,* at 194 (POWELL, J., concurring).

Furthermore, our decisions regarding standing to sue in actions brought under the Administrative Procedure Act make plain that standing is not to be denied merely because the ultimate harm alleged is a threatened future one rather than an accomplished fact. *United States* v. *SCRAP, supra; Sierra Club* v. *Morton, supra.*   Nor has the fact that the administrative action ulti-

---

[10] It clearly cannot be determinative for purposes of constitutionally required standing that there is only a probabilistic connection between the immediate interest, to which injury is alleged, and some more ultimate injury to the complaining party. *United States* v. *SCRAP,* 412 U. S., at 689 n. 14, specifically rejected the argument that for standing purposes "significant" injury must be alleged. Rather, the Court held that Art. III policies were adequately fulfilled even though the ultimate injury is very small indeed. *Ibid.* Clearly there is no difference for purposes of Art. III standing— personal interest sufficient for concrete adverseness—between a small but certain injury and a harm of a larger magnitude discounted by some probability of its nonoccurrence.   If the probability of the more ultimate harm is so small as to make the claim clearly frivolous, "the plaintiff can be hastened from the court by summary judgment." *Barlow* v. *Collins, supra,* at 175 n. 10 (opinion of BRENNAN, J.); *United States* v. *SCRAP, supra,* at 689, and n. 15.   See, *e. g., Granite Falls State Bank* v. *Schneider,* 319 F. Supp. 1346 (WD Wash. 1970), summarily aff'd, 402 U. S. 1006 (1971).   Obviously, however, if the respondents had demonstrated that the IRS was "encouraging" the hospitals affecting them to withdraw provision of medical services for indigents, the probability of the occurrence of the more ultimate injury would be sufficient to confer *standing* upon the respondents to challenge the action.

mately affects the complaining party only through responses to incentives by third parties been fatal to the standing of those who would challenge that action. *United States* v. *SCRAP, supra; Barlow* v. *Collins, supra.* And the ultimate harm to respondents threatened here is obviously much more "direct and perceptible" and the "line of causation" less "attenuated" than that found sufficient for standing in *United States* v. *SCRAP*, 412 U. S., at 688.

Certainly the Court's attempted distinction of *SCRAP* will not "wash." The Court states that in *SCRAP*, "although the injury was indirect and 'the Court was asked to follow an attenuated line of causation,' . . . the complaint nevertheless 'alleged a specific and perceptible harm' flowing from the agency action." *Ante,* at 45 n. 25. The instant case is different, the Court says, because the complaint "fails to allege an injury that fairly can be traced" to the allegedly wrongful action. I find it simply impossible fairly and meaningfully to differentiate between the allegations of the two sets of pleadings. Compare App. 13–25 in this case with App. 8–12 in No. 72–562, O. T. 1972, *Aberdeen & Rockfish R. Co.* v. *SCRAP.* The Court complains that "whether the injuries fairly can be traced to [the disputed] Ruling depends upon unalleged and unknown facts about the relevant hospitals." *Ante,* at 45 n. 25. It is obvious that the complaint in *SCRAP* lacked precisely the same specific factual allegations; there, however, the Court's response was much more in keeping with modern notions of civil procedure. 412 U. S., at 689–690, and n. 15.

Moreover, apart from the specificity required of the pleadings, it is not apparent why these "unalleged and unknown facts about the relevant hospitals" are required to establish injury in fact at all. As the Court notes, *ante,* at 42 n. 23, the earlier Revenue Ruling requires a hospital only to provide medical care "to the ex-

tent of its financial ability" and stated that a low charitable record was not conclusive on the point. Accordingly, in the absence of some showing to the contrary by the petitioners, it readily can be inferred that a hospital under the earlier Ruling would provide *some* indigent services, the maximum extent being the point at which the benefits received from the favorable tax status were exactly offset by the cost of the services conferred. If respondents had demonstrated at the summary judgment stage a connection between the disputed Ruling withdrawing this incentive and the hospitals affecting them, they would have certainly made a showing of injury to their "opportunity and ability" to receive medical care sufficient under *SCRAP* for *standing* to challenge the governmental action.

We may properly wonder where the Court, armed with its "fatally speculative pleadings" tool, will strike next. To pick only the most obvious examples, Will minority schoolchildren now have to plead and show that in the absence of illegal governmental "encouragement" of private segregated schools, such schools would not "elect to forgo" their favorable tax treatment, and that this will "result in the availability" to complainants of an integrated educational system? See *Green* v. *Kennedy,* 309 F. Supp. 1127 (DC 1970), later decision reported *sub nom. Green* v. *Connally,* 330 F. Supp. 1150, summarily aff'd *sub nom. Coit* v. *Green,* 404 U. S. 997 (1971).[11] Or will black Americans be required to plead and show that in the absence of illegal governmental encouragement, private institutions would not "elect to

---

[11] I note that this Court summarily affirmed in *Coit* v. *Green,* a case in which the standing issue was expressly raised on appeal. See Jurisdictional Statement 11 in No. 71–425, O. T. 1971. The court below in that case found standing without any such gratuitous allegations or showings respecting injury in fact. 309 F. Supp., at 1132.

forgo" favorable tax treatment, and that this will "result in the availability" to complainants of services previously denied? See *McGlotten* v. *Connally,* 338 F. Supp. 448 (DC 1972); *Pitts* v. *Wisconsin Dept. of Revenue,* 333 F. Supp. 662 (ED Wis. 1971). As perusal of these reported decisions reveals, the lower courts have not assumed that such allegations and proofs were somehow required by Art. III.

## C

Of course, the most disturbing aspect of today's opinion is the Court's insistence on resting its decision regarding standing squarely on the irreducible Art. III minimum of injury in fact, thereby effectively placing its holding beyond congressional power to rectify. Thus, any time Congress chooses to legislate in favor of certain interests by setting up a scheme of incentives for third parties, judicial review of administrative action that allegedly frustrates the congressionally intended objective will be denied, because any complainant will be required to make an almost impossible showing. Clearly the Legislative Branch of the Government cannot supply injured individuals with the means to make the factual showing in a specific context that the Court today requires. More specific indications of a congressional desire to confer standing upon such individuals would be germane, not to the Art. III injury-in-fact requirement, but only to the Court's "zone of interests" test for standing, that branch of standing lore which the Court assiduously avoids reaching. *Ante,* at 39 n. 19.[12]

---

[12] This is apparently the point the Court wishes to drive home by means of the following statement, *ante,* at 41 n. 22:

"The reference in *Linda R. S.* to 'a statute expressly conferring standing' was in recognition of Congress' power to create new interests the invasion of which will confer standing. . . . When

In our modern-day society, dominated by complex legis-
lative programs and large-scale governmental involve-
ment in the everyday lives of all of us, judicial review of
administrative action is essential both for protection of
individuals illegally harmed by that action, *Flast* v.
*Cohen,* 392 U. S. 83, 111 (1968) (Douglas, J., concurring),
and to ensure that the attainment of congressionally man-
dated goals is not frustrated by illegal action, *Barlow* v.
*Collins,* 397 U. S., at 173–175, and n. 9 (opinion of
BRENNAN, J.). See Albert, 83 Yale L. J., *supra,* n. 8, at
451–456. In dissenting from the Court's earlier crea-
tion of the "zone of interests" test applicable to standing
for review under the Administrative Procedure Act, an
inquiry that confuses standing with aspects of review-
ability and the merits, I said:

> "[I]n my view alleged injury in fact, reviewability,
> and the merits pose questions that are largely distinct
> from one another, each governed by its own consid-
> erations. To fail to isolate and treat each inquiry
> independently of the other two, so far as possible, is
> to risk obscuring what is at issue in a given case, and
> thus to risk uninformed, poorly reasoned decisions
> that may result in injustice. Too often these various
> questions have been merged into one confused in-
> quiry, lumped under the general rubric of 'stand-
> ing.' The books are full of opinions that dismiss
> a plaintiff for lack of 'standing' when dismissal, if
> proper at all, actually rested either upon the plain-
> tiff's failure to prove on the merits the existence of
> the legally protected interest that he claimed, or on
> his failure to prove that the challenged agency action

Congress has so acted, the requirements of Art. III remain: 'the
plaintiff still must allege a distinct and palpable injury to him-
self, even if it is an injury shared by a large class of other possible
litigants.' "

was reviewable at his instance." *Barlow* v. *Collins, supra,* at 176.[13]

Today, however, the Court achieves an even worse result through its manipulation of injury in fact, stretching that conception far beyond the narrow bounds within which it usefully measures a dimension of Art. III justiciability. The Court's treatment of injury in fact without any "particularization" in light of either the policies properly implicated or our relevant precedents threatens that it shall "become a catchall for an unarticulated discretion on the part of this Court" to insist that the federal courts "decline to adjudicate" claims that it prefers they not hear. *Poe* v. *Ullman,* 367 U. S., at 530 (Harlan, J., dissenting).

---

[13] See also Davis, The Liberalized Law of Standing, 37 U. Chi. L. Rev. 450, 469 (1970). After today's decision the lower courts will understandably continue to lament the intellectual confusion created by this Court under the rubric of the law of standing. *E. g., Scanwell Laboratories* v. *Shaffer,* 137 U. S. App. D. C. 371, 373, 424 F. 2d 859, 861 (1970): "The law of standing as developed by the Supreme Court has become an area of incredible complexity. Much that the Court has written appears to have been designed to supply retrospective satisfaction rather than future guidance. The Court has itself characterized its law of standing as a 'complicated specialty of federal jurisdiction.' . . . One cannot help asking why this should be true."