Victor BOWKER et al.,
Plaintiffs-Appellants,

v.

Rogers C. B. MORTON et al.,
Defendants-Appellees,

and

Kern County Water Agency et al.,
Intervenors-Appellees.

No. 75–2004.

United States Court of Appeals,
Ninth Circuit.

Aug. 31, 1976.

Sheldon L. Greene (argued), Greene, Kelley, Halloran & Litwin, San Francisco, Cal., Arthur Brunwasser (argued), San Francisco, Cal., for plaintiffs-appellants.

Carl Strass (argued), Dept. of Justice, Washington, D.C., William M. Chamberlain, and Gregory Wilkinson (both argued), Dept. of Justice, San Francisco, Cal., for defendants-appellees.

OPINION

Before BARNES, WRIGHT and SNEED, Circuit Judges.

SNEED, Circuit Judge:

This case comes before us on interlocutory appeal under 28 U.S.C. § 1292(b) from a dismissal by the district court of one of plaintiffs' claims. The action involves the question of whether federal reclamation law is applicable to a state irrigation project which utilizes several facilities which were jointly constructed by the state and federal governments. The major implication of the application of federal reclamation law would be a requirement that each recipient of irrigation water must dispose of all his land in excess of 160 acres. The district court dismissed a claim alleging that federal law is *ipso facto* applicable to such a state project. It is this claim which is on appeal here. We do not reach the merits of the claim since it is our view that plaintiffs do not have standing to bring this action.

I. *The Facts.*

The Central Valley Project is a system of dams and canals for water conservation and distribution which was designed during the 1920's and 1930's for irrigation of California's Central Valley. Additional facilities have been constructed since that time. The construction of the project was under the supervision of the Federal Bureau of Reclamation. Because the Central Valley Project was financed by federal funds, farmers who obtain water from the project must live on or near the land which is being irrigated and must dispose of all land in excess of 160 acres at a price which assumes the nonavailability of irrigation water from federal sources.

More recently, California has financed and constructed an irrigation system known as the State Water Project. Both the state and federal projects needed a reservoir for water storage in the San Luis area; however, only one reservoir site was available. The San Luis Act (Pub.L. No. 86–488, 74 Stat. 156, June 3, 1960) authorized the Secretary of the Interior to negotiate an agreement with California which would provide for the joint construction and operation of the San Luis Reservoir and related structures. The agreement which was reached did not explicitly provide that federal reclamation law limitations should apply to the state irrigation system receiving water from the San Luis Reservoir. The Department of Interior's Solicitor and the Attorney General concluded that the agreement was consistent with the San Luis Act. As required by the San Luis Act, the agreement was submitted to Congress for approval and was not disapproved within the ninety-day review period provided by the statute.

■ Plaintiffs-appellants brought this action seeking application of the federal reclamation laws, in particular the 160-acre and residency limitations,[1] to the state irriga-

---

1. 43 U.S.C. § 423e limits each recipient of water to 160 acres of land. The residency requirement, whatever its scope may be, appears in 43 U.S.C. § 431.

tion project. One of the appellants' claims, asserting that federal reclamation limitations are applicable to the state project due to the existence of hidden federal operating subsidies, was not dismissed by the district court. For the purposes of this appeal, therefore, it must be assumed that the state service area is operated without cost to the federal government.[2]

## II. *The Question of Standing.*

■■ The district court based its conclusion that plaintiffs have standing on *Data Processing v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). *Data Processing* set forth two requirements for standing: (1) the action challenged must have caused the plaintiff injury in fact (economic or other); and (2) the interest sought to be protected must arguably be within the zone of interests to be protected by the statute in question. The Supreme Court has made it clear that the *Data Processing* test, which enlarges the class of injury which may be alleged in support of standing, does not constitute "abandoning the requirement that the party seeking review must himself have suffered an injury." *Sierra Club v. Morton,* 405 U.S. 727, 738, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). Our analysis of plaintiffs' standing to sue is structured by the most recent discussions of the Supreme Court in this area in *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) and *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). A plaintiff seeking the aid of a federal court must allege facts from which it can be reasonably inferred that plaintiffs' injury resulted in a "concretely demonstrable

way" from defendant's action *and* that a grant by the court of the relief sought will remedy the wrong plaintiffs suffer. *Id.* at 504, 95 S.Ct. 2197 (1975). *See also, Linda R. S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). Plaintiffs may not rely on "the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had respondents acted otherwise, and might improve were the court to afford relief." *Warth v. Seldin, supra,* 422 U.S. at 507, 95 S.Ct. at 2209; *Simon v. Eastern Kentucky Welfare Rights Organ., supra,* —— U.S. at ——, 96 S.Ct. at 1924. Compactly put, the test for standing applicable to this case is that the plaintiffs must have alleged (a) a particularized injury (b) concretely and demonstrably resulting from defendants' action (c) which injury will be redressed by the remedy sought.[3]

■■ The plaintiffs in this case all allege to be small family farmers who are subject to the federal 160-acre limitation by virtue of the fact that all of them receive their irrigation water from federal sources. None of the plaintiffs receives any water from the state project even though it is the alleged illegal operation of the state project which is the gravamen of the complaint. Certainly plaintiffs cannot claim standing to attack the operation of one irrigation project on the basis of being the beneficiaries of another project. While we can imagine circumstances under which the illegal operation of one irrigation project might be the cause of a legally cognizable injury to the beneficiaries of some other project, plaintiffs here have not alleged such circumstances. Nor is there anything in the record to indicate that such circumstances

---

2. This implies that we do not have before us the question of plaintiffs' standing on the basis of the allegation that the failure to apply federal reclamation law in the operation of the state project has resulted in an enormous illegal subsidy to the large landholders in the state service area. However, even if this allegation is true, it is unclear how this causes any harm to plaintiffs. The fact that farmers in a neighboring irrigation project receive an illegal benefit, in and of itself, causes no harm to plaintiffs which is different from the harm done to an

ordinary taxpayer. It is clear that a taxpayer would have no standing to bring this case. *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

3. *Yellen v. Hickel,* 352 F.Supp. 1300 (S.D.Cal. 1972) is not consistent with this test. Without regard to the validity of its holding with respect to standing, it must be read against the backdrop of more recent Supreme Court pronouncements regarding standing.

exist. To this point plaintiffs have alleged no particularized injury.

Plaintiffs go on, however, to allege more specific injury. They state that the failure to enforce the 160-acre limitation in the state service area has resulted in no land being available in the state service area at "reasonable" prices to family farmers. Nowhere do plaintiffs allege that they have actually sought to buy land in the state service area. Nowhere do they state what price they could afford nor do they allege facts from which it can be reasonably inferred that the relief sought would bring an end to the harm of which they complain.

Although plaintiffs request an injunction forcing landowners in the state service area to sell all of their land at prices assuming the nonavailability of water, it is clear that such relief is not authorized by the statute. 43 U.S.C. § 423e. The most the district court could order would be a discontinuance of the water supply to the excess lands. The landowners in the state service area would have the option of giving up the water and retaining all of their land. This is no mere technical possibility. The statute as a condition to receiving water on excess lands would require the sale of such lands at a price assuming no irrigation. Assuming plaintiffs' allegations to be true, most of the landowners in the state service area own very large amounts of land. An alternative use of the land might easily be more attractive than a sale at the required price. In any event, it is a mere speculative possibility that any relief which is appropriate under the statute will bring about the result sought by plaintiffs. As in *Warth, supra,* the solution to plaintiffs' problem depends upon decisions and actions by third parties who are not before the court and who could not properly be the subject of a decree directing the result sought by plaintiffs. *See, Simon v. Eastern Kentucky Welfare Rights Organ., supra,* 426 U.S. at 39–44, 96 S.Ct. at 1925–1927. In sum, these allegations not only fail to set forth a a particularized injury resulting from the defendants' action, but also fail to show that the injury, the inability to obtain land, will be redressed by the available remedy sought.

Plaintiffs also allege that "[t]here has been an increase in the divergence of power between small and large landowners and an increase in monopolistic marketing practices." [4] Here again there is no reason to believe that the remedy sought will cure the plaintiffs' alleged injuries. Plaintiffs have not alleged that they are in a distinct and separate market with the state service area. Presumably plaintiffs will face competition from many large farms even if those in the state service area were to be broken up. It may well be that the market area in which plaintiffs compete is large enough so that the elimination of the large farms in the state service area would have no perceptible effect upon the market power of large farms as a group. Once more the plaintiffs' allegations have failed to show that the alleged harm would be redressed by the remedy sought.

■ Finally, the plaintiffs alleged that there was a failure to comply with the requirements of NEPA and that this failure has resulted in environmental deterioration in the area covered by the state water project. Plaintiffs do not allege, however, that this environmental deterioration will in any way affect them. Because the plaintiffs do not receive water from the state project and do not live in the state service area, it would appear that their position may be no different from that of a resident of New York who objected to violations of NEPA by the state project. In any event, this allegation reflects an abstract concern, not a particularized injury.

In short, we find that none of plaintiffs' allegations are sufficient to show standing. Therefore this appeal is vacated and we remand to the trial court for such action as is not inconsistent with this opinion.

VACATED and REMANDED.

4. We see no analytic distinction between the charge of an increase in the divergence of power and the charge of an increase in monopolistic practices. Increased market power will manifest itself in monopoly pricing.