Robert E. GONZALES, D. Ronald Hyde, and Mary K. Lee, Collectively and Individually, Plaintiffs,

v.

Douglas M. COSTLE, Administrator of the United States Environmental Protection Agency and his agents and servants thereof, Association of Bay Area Governments, and its agents and servants thereof, Edmund G. Brown, Jr., Governor of the State of California, State Water Resources Control Board of the State of California, Defendants.

No. C–76–2039 RFP.

United States District Court,
N. D. California.

Oct. 26, 1978.

Ronald A. Zumbrun, Raymond M. Momboisse, Thomas E. Hookano, Elleene A. Kirkland, and Robin L. Rivett, Pacific Legal Foundation, Sacramento, Cal., for plaintiffs Robert E. Gonzales, et al.

Arthur Harris, John Evans, Benner, Harris & Evans, Berkeley, Cal., for defendant ABAG.

Francis B. Boone, Asst. U. S. Atty., San Francisco, Cal., Irwin Karp, Environmental Protection Agency, Region IX, San Francisco, Cal., for defendant EPA.

Anthony C. Joseph, Deputy Atty. Gen., State of California, San Diego, Cal., for defendant State of California.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

This is a lawsuit brought by three individuals challenging activities of the United States Environmental Protection Agency (EPA), the Association of Bay Area Governments (ABAG), and the State of California in implementing the planning requirements of § 208 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1288. Plaintiffs have agreed to dismiss with prejudice [1] California state defendants Edmund G. Brown, Jr. and State Water Resources Control Board, and cross motions have been brought for summary judgment by plaintiffs and defendants EPA and ABAG. The basic issue is whether defendants have violated the law by spending funds under § 208 for other than strictly water pollution planning. For the reasons given below, we grant summary judgment for defendants, finding unduly narrow the interpretation of the Water Pollution Control Act amendments urged by plaintiffs.

## BACKGROUND

The lawsuit arose out of the process of selection of the "§ 208 planning agency" for the San Francisco Bay Area. Section 208 of the Federal Water Pollution Control Act Amendments of 1972 sets up procedures whereby the governor of a state can designate an agency to do water resource planning for areas within the state. 33 U.S.C. § 1288(a)(2). If the EPA approves the designated agency, it may grant funds to that agency to be used in developing a regional "waste treatment management plan." Regional water resource planning in the Bay Area was originally done by the Bay Area Sewer Service Association (BASSA), but the Governor of California did not choose BASSA as the § 208 planning agency. He set up the State Water Resources Control Board (SWRCB) and delegated his designation responsibilities to that agency. Pursuant to a state policy favoring a coordinated approach to regional pollution problems and planning, SWRCB in May 1975 selected the Association of Bay Area Governments (ABAG) for water planning. ABAG is the council of local governments for the nine county San Francisco Bay Area Region.

ABAG submitted an application to Region IX of the EPA for a § 208 planning

---

1. Defendant EPA opposes the motion to dismiss the California state defendants, but there is no need to rule on that opposition given the outcome of the summary judgment motions in favor of EPA and ABAG. There is also a motion by defendants to strike certain portions of the declaration of David Todd submitted by plaintiffs on behalf of their motion for summary judgment. The motion will be deemed denied in view of the fact that nothing in that declaration would change the outcome of the summary judgment decision.

grant. On June 23, 1975, the EPA awarded $4,302,890 to ABAG. In ABAG's original application for the § 208 grant, it recommended that planning be coordinated with a parallel air pollution planning program under the California Air Resources Board (CARB). The latter program was directed toward the production of an Air Quality Maintenance Plan pursuant to the Clear Air Act of 1970, 42 U.S.C. § 7401 *et seq.* CARB created an Air Quality Maintenance Plan Task Force to supervise air quality management planning, but in January 1976 its planning responsibilities were transferred to the newly-created ABAG Environmental Management Task Force, which, again consistent with the declared policy in favor of coordination, was also responsible for § 208 planning.

This Task Force developed and in April 1976 adopted an Environmental Management Plan Work Program. The EPA approved the Work Program as consistent with the requirements of § 208, and the two-year planning period commenced on June 21, 1976. The plan included a section on air quality maintenance and dealt also with solid waste matters. These aspects, especially the air quality part, are the subject of this lawsuit and are discussed further *infra.* The Task Force completed its plan and on June 10, 1978 the General Assembly of ABAG approved it. At that point the $4.3 million in § 208 planning funds had been spent by ABAG, although some further funding in the amount of $180,000 has subsequently been made available by the EPA.

This lawsuit commenced in September 1976. Plaintiffs initially included the Bay Area Sewage Service Agency (BASSA) and seven individuals in their capacities as BASSA officers and private citizens. The California State Legislature terminated the existence of BASSA on December 31, 1976, and four of the individual plaintiffs, as well as BASSA, withdrew from the litigation. The complaint originally challenged both the designation of ABAG (instead of BASSA) as the § 208 agency and the expenditures of funds made by ABAG pursuant to that designation. The first part of the complaint has been dropped. The second part alleges that EPA granted funds to ABAG which were improperly spent on air and solid waste planning. The suit challenges both EPA's criteria for allowing such expenditures and the actual expenditures made on the grounds that funds should have been used strictly for water resource planning. Plaintiffs are seeking declaratory and injunctive relief under 33 U.S.C. § 1365 and are asking that ABAG be compelled to restore funds improperly spent to the EPA.

## DISCUSSION

There are three issues that must be faced on this motion: (1) Do plaintiffs have standing to sue under the Federal Water Pollution Control Act Amendments of 1972 and Article III of the U. S. Constitution? (2) Is the issue moot in view of the undisputed fact that the $4.3 million was spent as of June 1978? (3) On the merits, are there undisputed issues which permit a ruling as to the legality of ABAG's disputed expenditures of EPA funds, and, if so, were those expenditures permissible?

### I. *The Issue of Standing*

This issue was previously raised by defendants in a motion to dismiss, denied by this court on May 4, 1977. The order found that under the appropriate test for standing in environmental cases, plaintiffs could proceed by alleging the following facts:

(1) that they are residents of the Bay Area who use and enjoy its waters, (2) that the wrongful use of section 208 funds for multi-purpose planning rather than only for water quality planning will degrade the quality of Bay Area waters, and (3) that such degradation of water quality will injure them in fact.

See *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

Defendants now contend that even if the allegations of plaintiffs were sufficient to withstand a motion to dismiss, there is in-

sufficient testimony on the record to support those allegations in order to withstand a motion for summary judgment. We disagree. Plaintiffs are within the liberal requirements for standing in environmental cases. Their allegations depend entirely on how the case is decided on the merits. To deny them a hearing on grounds of standing would be to decide the merits preliminarily. If the section 208 money had been wrongfully spent, plaintiffs would have suffered some slight damage as enjoyers of the Bay Area waters.

## II. *The Issue of Mootness*

■ Defendants also allege that mootness obviates the need to resolve the substantive issues in this case, given that the $4.3 million grant has been spent by ABAG. They emphasize that while plaintiffs filed the lawsuit in September 1976, they never moved for preliminary relief. ABAG was legally bound to spend its funding in accordance with the Work Plan approved by the EPA. While these factual allegations could be important in determining whether an injunction, were one to have been granted in this case, should be limited to prospective relief only,[2] they do not make the issues moot. The court could order that any money spent wrongfully be restored to the EPA by ABAG, and, in any event, it has been shown that at least one new grant has been made in addition to the $4.3 million already spent. On June 29, 1978, the sum of $180,000 was granted to ABAG as a "grant amendment" to cover, *inter alia,* "costs for finalizing management agency agreements, finalizing the joint workplan with the RWQB. . . ." The issue of ABAG's spending of EPA funds is not

moot. It is necessary to turn to the merits of plaintiffs' challenge.

## III. *Summary Judgment on the Merits*

■ Under rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be entered if the pleadings, depositions, answers to interrogatories, and affidavits show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The court is not entitled to hold a trial by affidavits and attempt to weigh the conflicting testimony, but there must be a genuine issue for trial for summary judgment to be denied.

> The showing of a "genuine issue for trial" is predicated upon the existence of a legal theory which remains viable under the asserted version of the facts, and which would entitle the party opposing the motion (assuming his version to be true) to a judgment as a matter of law.

*Bushie v. Stenocord Corp.,* 460 F.2d 116, 119 (9th Cir. 1972).

There are certainly disputed issues in this case, but even if they are resolved favorably to plaintiffs, plaintiffs' theory would still not be a viable one. As plaintiffs recognize, summary judgment is appropriate on the basic issue of what type of expenditures ABAG could make with its section 208 grant from EPA.

■ It is undisputed that ABAG's funding from EPA as a section 205 planning agency was utilized to help develop an Environmental Management Plan Work Program, an Air Quality Maintenance Plan under the Clean Air Act of 1970, and a Solid Waste Management Plan.[3] Despite full

---

**2.** Highly suggestive on this point is the recent case of *Associated General Contractors of California v. Secretary of Commerce,* 441 F.Supp. 955 (C.D.Cal.1977). Relying on the court's equitable power to consider all of the circumstances in determining the scope of the injunction to be ordered, the district court there limited the injunction to prospective relief rather than ordering restitution of sums found to have been illegally spent. *Id.* at 970–71.

**3.** The amount of that funding is in dispute. According to ABAG's report for the quarter

ending December 31, 1977, the $4.3 million was spent as follows: $1,911,880 for water quality planning; $233,015, air quality; $83,500, solid waste; $2,074,495, data collection, administration, integration, public participation, and supporting services. The latter figure includes water, air, and solid waste related expenditures, but ABAG does not have them broken down into more specific categories. Plaintiffs assert that the amount conceals the diversion of section 208 funding to nonwater planning, while defendants say that the figure simply

EPA approval of this approach, plaintiffs insist that it was an unlawful diversion of funds allocated to water pollution problems—the development of a regional waste treatment management plan and the environmental impact assessment of the effects of the adoption of that plan. They especially object to the amount expended on air quality planning, which represented at least $233,015 (5%) of the $4.3 million grant. Their superficially appealing argument is simply that federal money for clean water planning should not be used for clean air planning. Federal money for clean air, they assert, must come from the EPA under the Clean Air Act and analogous programs. While perhaps appealing because of its pristine simplicity, a closer look at plaintiffs' argument reveals that it must be rejected. All parties now agree that, as a practical matter, it would have been foolish to isolate air pollution control from water pollution control, and it appears that Congress recognized the necessity of coordination. The EPA has followed through on that intention, and ABAG has not overstepped the guidelines promulgated by the EPA.

Section 208 of the Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1288, states that the plan "shall include, but need not be limited to," the following considerations:

> (A) the identification of treatment works necessary to meet the anticipated municipal and industrial waste treatment needs of the area over a twenty-year period, annually updated (including an analysis of alternative waste treatment systems), including any requirements for the acquisition of land for treatment purposes; the necessary waste water collection and urban storm water runoff systems; and a program to provide the necessary financial arrangements for the development of such treatment works . . . ;[4]

> . . . . .

(E) the identification of the measures necessary to carry out the plan (including financing), the period of time necessary to carry out the plan, the costs of carrying out the plan within such time, and the economic, social, and environmental impact of carrying out the plan within such time;

> (F) a process to (i) identify, if appropriate, agriculturally and silviculturally related non-point sources of pollution, including return flows from irrigated agriculture, and their cumulative effects, runoff from manure disposal areas, and from land used for livestock and crop production, and (ii) set forth procedures and methods (including land use requirements) to control to the extent feasible such sources;

> . . . . .

> (H) a process to (i) identify construction activity related sources of pollution, and (ii) set forth procedures and methods (including land use requirements) to control to the extent feasible such sources;

> . . . . .

> (J) a process to control the disposition of all residual waste generated in such area which could affect water quality; and

> (K) a process to control the disposal of pollutants on land or in subsurface excavations within such area to protect ground and surface water quality.

33 U.S.C. § 1288(b)(2). Section 208(f) of the Act, 33 U.S.C. § 1288(f), allows the Administrator to "make grants to any agency designated under subsection (a) of this section for payment of the reasonable costs of developing and operating a continuing areawide waste treatment management planning process . . . ."

They accurately reflect the policy in favor of coordinating and consolidating the planning processes.

---

shows that support services could not be allocated to specific ends, given the close relationship between the water planning process and the process for other plans. Our holding in favor of ABAG's policy of coordination makes ABAG's accounting practices beyond question.

4. This clause was amended in 1977, but the amendment is not material to this litigation.

The statute therefore requires the plan to assess, *inter alia*, the "economic, social, and environmental impact of carrying out the plan," "land use requirements," and "residual waste" which could affect water quality. It expressly states that plans are not to be limited to those considerations, and the Administrator is given discretion to determine the "reasonable costs" entailed in the planning process. The legislative history also indicates a congressional desire to ensure that the waste treatment management planning process be considered in connection with other pollution problems. The Senate Report on the bill, for example, quoted with approval the following declaration of the Senate Subcommittee on Water Pollution:

> The Committee's goal is a policy for adequate management of all forms of environmental pollution and for effective protection of the environment. A policy for air pollution only, a policy for water pollution only, a policy for solid waste disposal only, will not suffice. A broad policy and a coordinated effort are imperative.

S.Rep. No. 414, 92d Cong., 1st Sess. 3 (1971), *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 3668, 3670.

The EPA has issued numerous regulations to enforce the congressional mandate in favor of coordination in the anti-pollution effort. Regulations printed at 40 C.F.R. § 130.34 specifically require coordination between section 208 plans and air quality maintenance plans under the Clean Air Act of 1970:

> (a) The process shall assure that State water quality management plans are coordinated, and shall describe the relationship with plans for designated areawide planning areas within the State, with planning required in adjacent States under section 208 of the Act, with affected State, local, and Federal programs, and with other applicable resource and developmental planning including:
>
> (1) State and local land use and development programs.
> (2) Activities stemming from applicable Federal resource and developmental programs including:
> (i) *The Solid Waste Disposal Act*, as amended (Pub.L. 91–512).
>
> .    .    .    .    .
>
> (iii) *The Clean Air Act*, as amended (Pub.L. 91–604).

An EPA Regional IX (including California) memorandum, subsequently adopted as national policy,[5] provided explicit guidelines on the "Use of 208 Funds with Respect to Air Quality." It suggested that eligible air quality expenditures with section 208 funds would include the development of common data bases, public participation, plan adoption procedures, common implementation measures, common institutional arrangements for plan adoption, implementation, and revision, analysis of cost effectiveness of air quality controls which use water related facilities to achieve implementation, legislative proposals relating air, water, and land use, common impact assessment procedures and criteria, air quality assessment of existing and projected development to be served by water and waste-water facilities, strategies for mitigating section 208 plan air quality impacts, and identification of management agencies. Fed'l Rec. 92–93. The memorandum also listed activities which could not be funded with the section 208 grant. Principal activities on the latter list were the following: developing and/or perfecting air quality monitoring and surveillance; collecting ambient and source emissions air quality data; compiling the base year emission inventory; analyzing interbasin air pollution transport phenomena; developing air quality dispersion and meteorological modeling, although not precluding

---

5. The policy was represented in a "Planning Program Guidance Memorandum: SAM–8," dated November 15, 1975, and entitled "Relationship Between Air Quality Planning and the State and Areawide Water Quality Management Program, Eligible Uses of Section 208 Funds for Air Quality Uses." Affidavit of Harry Seraydarian, Jr. in Support of Federal Defendants Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, p. 5 and Exhibit 1.

the refinement of existing models, the operation of the models, and the analysis of the output of the model. Rec. 91.

Plaintiffs challenge both the EPA's enumeration of permissible tasks and whether ABAG has confined its expenditures of section 208 funds to the enumerated tasks. They insist in particular that there are five contracts which were solely for air quality in violation of the EPA guidelines. The contracts were with the Bay Area Pollution Control District ($119,-000), the Metropolitan Transportation Commission ($80,000), Comsis, Inc. ($5,000), Systems Applications, Inc. ($7,000), and Sedway-Cooke ($6,500). These contracts contributed to the development by ABAG of the Air Quality Maintenance Plan, but that does not make them impermissible. Plaintiffs rely on an erroneous view of the law, insisting that "Section 208 funds *were not used for assessing the impacts of the water quality plan, but for assessing the impacts of the air quality plan which was being developed*, an improper use of Section 208 funds." (Emphasis in original.) Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Cross Motion for Summary Judgment, Etc. p. 19. This reflects their misunderstanding of how pollution problems interrelate and have reciprocal impacts. Air and water impact both depend on closely related possibilities and contingencies. The construction of new sewage facilities, for example, may promote urban growth, leading to more automobile traffic and increased air pollution. Methods for reducing industrial air pollution may result in increased water pollution. And projections of the rate, magnitude, and location of population and industrial growth are obviously vital to developing workable anti-pollution programs. This interrelationship of impacts underlies the policy in favor of coordination and the EPA guidelines, and there is nothing to suggest that ABAG's expenditures show more than a reflection of this policy. The EPA's policy allowing the impacts of air and water quality plans to be assessed concurrently merely recognizes a necessity if the plans are to be more than exercises in futility.

ABAG and EPA administrators, furthermore, worked very closely in determining the proper expenditures for the section 208 grant. For example, according to the EPA project officer in charge of the implementation of the ABAG grant, his schedule allowed at least weekly meetings with ABAG staff and daily telephone contact. ABAG's activities were undertaken with the full knowledge and understanding of the EPA, which expressly took a liberal view toward section 208 expenditures to help in the production of other coordinated environmental plans necessary to the effectiveness of the water pollution program. This is the classic situation in which an administrative practice "involves a contemporaneous construction of a statute by the men charged with the responsibilities of setting its machinery in motion, of making its parts work efficiently and smoothly while they are yet untried and new." *Udall v. Tallman*, 308 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Great deference is owed to the agency in such a situation. As reiterated recently by the Supreme Court in upholding the EPA's construction of the Clean Air Act of 1970, the agency's interpretation must be given considerable deference.

> We therefore conclude that the Agency's interpretation of §§ 110(a)(3) and 110(f) was "correct," to the extent that it can be said with complete assurance that any particular interpretation of a complex statute such as this is the "correct" one. Given this conclusion, as well as the facts that the Agency is charged with administration of the Act, and that there has undoubtedly been reliance upon its interpretation by the States and other parties affected by the Act, we have no doubt whatever that its construction was sufficiently reasonable to preclude the Court of Appeals from substituting its judgment for that of the Agency.

*Train v. Natural Resources Defense Council*, 421 U.S. 60, 87, 95 S.Ct. 1470, 1485, 43 L.Ed.2d 731 (1974) (citations omitted). Precisely the same conclusion should be reached with respect to the EPA's interpretation of the Federal Water Pollution Act Amendments of 1972.

## CONCLUSION

The problems of air, solid waste, and water pollution are enormous, and only a coordinated attack on those and other environmental problems has any possibility of success. No one in this case challenges this fundamental fact, which was recognized by Congress, and the EPA and ABAG have grounded their activities on this recognition. Plaintiffs wish to oppose the EPA and ABAG on the basis that section 208 moneys "were intended to be spent on cleaning up the nation's *waters*—and nothing else." Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Summary Judgment, p. 32. Fortunately, this narrow and potentially counterproductive approach was not that of the Congress.

Summary judgment is granted in favor of defendants, EPA and ABAG and the case dismissed with respect to all defendants.

SO ORDERED.