**Robert E. GONZALES, et al.,
Plaintiffs-Appellants,**

v.

**Ann McGill GORSUCH,\* Administrator of the United States Environmental Protection Agency, et al., Defendants-Appellees.**

**No. 78-3729.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 12, 1980.

Decided Sept. 28, 1982.

\* We substitute Ann McGill Gorsuch, the Administrator of the United States Environmental Protection Agency, as successor to the original appellee Douglas M. Costle, the former Administrator, pursuant to Fed. R. App. P. 43.

Robin L. Rivett, Sacramento, Cal., for plaintiffs-appellants.

Jacques B. Gelin, Dept. of Justice, Washington, D.C., argued, for defendants-appellees; John Evans, Benner, Harris & Evans, Berkeley, Cal., Francis B. Boone, Asst. U.S. Atty., San Francisco, Cal., on brief.

Before WALLACE and KENNEDY, Circuit Judges, and BURNS,** District Judge.

KENNEDY, Circuit Judge:

This suit challenges the propriety of expenditures approved by the Environmental Protection Agency [EPA] and made by the Association of Bay Area Governments [ABAG].[1] ABAG made the expenditures pursuant to a workplan under section 208 of the Federal Water Pollution Control Act (herein the Clean Water Act), 33 U.S.C. § 1288 (1976). EPA funded the plan through a $4.3 million grant authorized un-

---

** Honorable James M. Burns, Chief Judge, United States District Judge for the District of Oregon, sitting by designation.

1. ABAG is a public entity comprised of 92 local governments. It is formed under California's Joint Exercise of Powers Act. Cal. Gov't Code §§ 6500–6516 (West 1980 & Supp. 1981).

der section 208(f), 33 U.S.C. § 1288(f) (1976).

After the planning began, but before its completion, Gonzales[2] brought this suit. The theory of the suit was that some of the grant funds used by ABAG were for contracts not related to water pollution. These, it was contended, were improper expenditures under section 208, and hence could not be legally funded. After finding standing and reaching the merits, the court below denied the requested injunctive and declaratory relief and entered summary judgment for the EPA. *Gonzales v. Costle,* 463 F.Supp. 335 (N.D. Cal. 1978). Gonzales appeals, and we now affirm.

### I.

In 1972, Congress amended the FWPCA. Pub. L. 92–500, 86 Stat. 839 (1972). The amendments provided for a comprehensive state and federal program to improve the nation's water quality. As part of the program, section 208 of the amended Act authorizes areawide waste treatment management plans, administered by local government and funded by the EPA.

In May of 1975, pursuant to section 208(a)(2) of the Clean Water Act, 33 U.S.C. § 1288(a)(2) (1976), ABAG was selected as the local entity responsible for developing a clean water plan for the San Francisco Bay Area. ABAG then applied for, and received, an EPA grant of $4.3 million to develop and implement a section 208 workplan.

In addition to the responsibility for developing a clean water plan, ABAG was also designated by the state as the local entity in charge of a Bay Area Air Quality Maintenance Plan [AQMP][3] and, eventually, a Solid Waste Management Plan [SWMP].[4] Appropriate funding for development and implementation of these plans soon followed.[5] ABAG consolidated the three programs into one plan, the ABAG Environmental Management Plan. The EPA approved it in 1976. ABAG then began the planning period required by section 208.[6]

Gonzales filed suit in September of 1976. After discovery, his claim was reduced to the assertion that approximately 5 percent of the contracts funded by the section 208 grant were for the regional AQMP and the SWMP, instead of for improvement of water quality.[7] He asked the court to declare the contracts illegal as in excess of 208 funding authority and for an injunction against their execution or payment.

No temporary restraining order or other preliminary relief was sought. Indeed, Gonzales waited almost one year before commencing discovery. When the court below ruled on the parties' cross-summary judgment motions, the two year planning period was over, and most of the original funds had been spent. In 1978 the EPA,

---

2. As the complaint originally was filed, Gonzales was joined by six other individuals and an agency which had competed with ABAG for the EPA grant. As the suit progressed, the agency and four of the individuals withdrew, leaving Gonzales and two others. Because all three plaintiffs have alleged identical interests here, that of injury to the environment, we will hereinafter refer to Gonzales only.

3. This designation was made pursuant to the Clean Air Act, 42 U.S.C. §§ 7401-7642 (1976).

4. This designation was made pursuant to the Solid Waste Disposal Act, 42 U.S.C. §§ 6901 - 6956 (1976).

5. In its brief, the EPA has informed us that ABAG has received at least $4,000,000 for the AQMP and $689,000 for the SWMP from sources other than section 208 grants.

6. Under section 208(f)(2), 33 U.S.C. § 1288(f)(2), Congress provided full funding for "developing and operating a continuing areawide waste treatment and management planning process" for two years. ABAG completed this two-year process on June 10, 1978. EPA gave its final approval in January of 1979.

7. Gonzales points to four contracts, paid for with section 208 funds, which he claims are unrelated to water pollution planning. These contracts were let to: the Bay Area Air Pollution Control District (for $119,000); the Metropolitan Transportation Commission (for $86,000); Comsis, Inc. (for $5,000); and Systems Applications, Inc. (for $7,000).

The total amount involved is $211,000, although Gonzales claims further misappropriations allegedly masked by ABAG's accounting procedures.

however, had granted ABAG an additional $180,000 for the final part of the workplan. The district court found that the plaintiffs had standing, that the case was not moot, and that section 208 authorized the expenditures. *Gonzales v. Costle,* 463 F.Supp. 335, 337–41 (N.D. Cal. 1978). We agree the suit should be dismissed but for a reason other than that adopted by the district court. We find the plaintiff has no standing to maintain the suit.

## II.

Gonzales seeks to invoke the jurisdiction of the federal court under the citizen's suit provision of the Clean Water Act. The citizen-suit provision of the Clean Water Act, 33 U.S.C. § 1365(a)(2) (1976), provides:

> (a) Except as provided in subsection (b) of this section [dealing with notice to the EPA] any citizen may commence a civil action on his own behalf—... (2) against the Administrator where there is an alleged failure of the Administrator to perform any act or duty under this chapter [ch. 26 of title 33, §§ 1251–1376] which is not discretionary with the Administrator. The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to ... order the Administrator to perform such act or duty, as the case may be ....

The legislative history reinforces the import of the statutory language that § 1365(a)(2) was intended to grant standing to a nationwide class, comprised of citizens who alleged an interest in clean water. Senators Bayh and Muskie, the latter, one of the Act's principal draftsmen, discussed the Conference Report:

> *Mr. Bayh.* Would an interest in a clean environment—which would be invaded by a violation of the Federal Water Pollution Control Act or a permit thereunder—be an "interest" for the purposes of this section?
>
> *Mr. Muskie.* That is the intent of the conference... The conference report states: "It is the understanding of the conferees that the conference substitute relating to the definition of the term 'citizen' reflects the decision of the U.S. Supreme Court in the case of *Sierra Club v. Morton* [405 U.S. 727 [92 S.Ct. 1361, 31 L.Ed.2d 636] (1972)]." ... It is clear that under the language agreed to by the conference, a noneconomic interest in the environment, in clean water, is a sufficient base for a citizen suit under section 505.
>
> Further, every citizen of the United States has a legitimate and established interest in the use and quality of the navigable waters of the United States. Thus, I would presume that a citizen of the United States, regardless of residence, would have an interest as defined in this bill regardless of the location of the waterway and regardless of the issue involved.
>
> *Mr. Bayh.* I thank my good friend from Maine. I believe that the conference provision will not prevent any person or group with a legitimate concern about water quality from bringing suit against those who violate the act or a permit, or against the Administrator if he fails to perform a nondiscretionary act. These sorts of citizen suits—in which a citizen can obtain an injunction but cannot obtain money damages for himself—are a very useful additional tool in enforcing environmental protection laws. I am glad to see that authority for such suits is included in this bill.

Committee on Public Works, *A Legislative History of the Water Pollution Control Act Amendments of 1972,* 221 (1973).

■ Congress by section 1365(a)(2) thus granted every citizen a litigable interest in the enforcement of all nondiscretionary acts and duties of the EPA.

■■ A personal stake in the outcome is central to the question of standing. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) ("a personal stake in the outcome—is the gist of the question of standing"). Plaintiff's interest as one who uses and enjoys the Bay is sufficient to meet the liberal personal stake requirement applicable to environmental plaintiffs. *See Duke Power Co. v. Carolina Environmental*

*Study Group,* 438 U.S. 59, 72–74, 98 S.Ct. 2620, 2629–2631, 57 L.Ed.2d 595 (1978); *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 678, 687, 93 S.Ct. 2405, 2411, 2416, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972).

■ Plaintiff's standing fails, nevertheless, as the relief sought will not redress the inquiries alleged. It is a prerequisite of justiciability that judicial relief will prevent or redress the claimed injury, or that there is a significant likelihood of such redress. *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38–39, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); *Pacific Legal Foundation v. State Energy Resources Conservation and Development Comm'n,* 659 F.2d 903 at 910 (9th Cir. October 15, 1981); *Bowker v. Morton,* 541 F.2d 1347, 1347 (9th Cir. 1976). Redressability in this sense is an aspect of standing.

■ There is a close relation between the requirement of power to redress a claimed injury and the requirement of a causal link between the injury asserted and the relief claimed. *See, e.g., Duke Power Co.,* 438 U.S. at 74, 98 S.Ct. at 2631. The two requirements, however, do diverge. On the one hand, the causal connection requirement focuses upon the relation between the defendant or the defendant's conduct and the plaintiff's injury. Redressability requires an analysis of whether the court has the power to right or to prevent the claimed injury. In this respect, the potential for redress assures that the plaintiff's stake in the lawsuit's outcome remains high throughout the litigation.

■ The tie between the causation requirement and the court's power to afford appropriate relief is usually strong enough to permit an "infer[ence] that correction of the defendant's improper conduct will relieve the injury caused thereby," *Legal Aid Soc'y of Alameda County v. Brennan,* 608 F.2d 1319, 1335 (9th Cir. 1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980); *see also Davis v. U.S. Dept. of*

*Housing and Urban Development,* 627 F.2d 942 at 945, but the inference is broken if the injury alleged and the redress sought are so remote that no connection at all may be discerned. *Boating Indus. Ass'ns v. Marshall,* 601 F.2d 1376, 1379–80 (9th Cir. 1979); *Bowker,* 541 F.2d at 1349.

■ The court's inability to redress the claimed injury may be manifest in various ways. Circumstances may indicate that the requested relief will actually worsen the plaintiff's position. *See, e.g., NAACP, Boston Chapter v. Harris,* 607 F.2d 514, 520 (1st Cir. 1979) (challenge to block grant recipient's eligibility, if successful, would entail that grant program's purposes would never be implemented in plaintiff's city). The requested relief may be insufficient because of the court's inability to formulate any meaningful decree. *See, e.g., Greater Tampa Chamber of Commerce v. Goldschmidt,* 627 F.2d 258, 263–64 (D.C. Cir. 1980) (invalidation of international executive agreement will not redress injury because act of foreign sovereign necessary for relief); *Boating Indus. Ass'ns v. Marshall,* 601 F.2d 1376 (9th Cir. 1979) (rescission of administrative interpretive notice would not redress injury because no guarantee existed that rescission would later bind court). The focus, however, is always upon the ability of the court to redress the injury suffered by the plaintiff; if the wrong parties are before the court, or if the requested relief would worsen the plaintiff's position, or if the court is unable to grant the relief that relates to the harm, the plaintiff lacks standing. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91 at 100, 99 S.Ct. 1601 at 1608, 60 L.Ed.2d 66; *Duke Power Co.,* 438 U.S. at 78, 98 S.Ct. at 2633; *Bowker,* 549 F.2d at 1349.

■ The standing conferred by the statute before us is comprehensive, but nothing in the legislative history indicates that Congress intended to ignore or to test the conventional requisites of justiciability. We find no congressional intent to confer standing to seek relief that will not actually

redress the injuries the parties have incurred.[8]

■ In the instant case, redress for the wrong alleged by the plaintiff is beyond the limits of a judicial decree properly issued based on the allegations of the complaint. A temporary restraining order or other preliminary relief was sought. Gonzales waited almost one year before commencing discovery and, as a consequence, by the time the court below ruled on cross-motions for summary judgment, the two year planning period was over, and most of the original sums had been spent. The court below proceeded on the assumption that it could order ABAG to refund any illegally spent funds, but even if this were so it would not redress the claimed injury, and the court would not bring about the water pollution planning Gonzales sought. Any injunction against future action, moreover, would proceed necessarily on an unsubstantiated assumption that more grants would be forthcoming. The district court found that one additional grant had been made since commencement of the suit, but its purpose was to complete the work planned. Section 208 workplans have a limited life, and plaintiffs did not allege that defendants would require or receive further grants. "Plaintiffs may not rely on 'the remote possibility, unsubstantiated by allegations of fact, that their situations might have been better had respondents acted otherwise, and might improve were the court to afford relief.'" *Bowker v. Morton,* 541 F.2d 1347, 1349 (9th Cir. 1976), quoting *Warth v. Seldin,* 422 U.S. 490, 507, 95 S.Ct. 2197, 2209, 45 L.Ed.2d 343 (1975). Such speculation is contrary to the requirement that it be "substantially likely" redress will occur. *Duke Power Co.,* 438 U.S. at 79, 98 S.Ct. at 2633.

Allegations of unauthorized spending are not necessarily inconsistent with justiciability. We do not address the case where Congress has sought to subject misappropriations by a wayward bureaucracy to judicial review at the insistence of a member of a statutory class. Here the purpose of the statute is to insure that an interest in the environment and clean water, whether or not economically based, is a sufficient basis for a citizen suit. This grant of standing does not extend to a review of appropriations where the review and any judicial decree would be ineffective to vindicate environmental concerns. Accordingly, appellant lacks standing to maintain the action. Although the district court dismissed the action for reasons other than those we have addressed, the ultimate judgment of dismissal was correct.

AFFIRMED.

WALLACE, Circuit Judge, concurring:

I concur in the result reached by the majority. I agree that Gonzales lacks standing to maintain this action. There are, however, parts of the opinion with which I do not agree. Therefore, I write separately to address this significant issue: congressional power to alter or amend the rules governing standing in the federal courts.

For many years it has been clear that the doctrine of standing embodies both constitutional limitations on federal-court jurisdiction, derived from the "case or controversy" clause of Article III, and prudential considerations of judicial self-restraint governing its exercise. *See, e.g., Warth v. Seldin,* 422 U.S. 490, 498–501, 95 S.Ct. 2197, 2204–2206, 45 L.Ed.2d 343 (1975); *Construction Industry Ass'n v. City of Petaluma,* 522 F.2d 897, 903–05 (9th Cir. 1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976); *Nevin v. Ferdon,* 413 F.Supp. 1043, 1046 n. 5 (N.D. Cal. 1976) (per curiam) (three-judge district court). Although the Supreme Court has not always clearly articulated whether particular aspects of the standing doctrine are constitutional or prudential, *see Valley Forge Christian College v. Americans United for Separation of*

---

8. We therefore do not reach the issue addressed by Judge Wallace in his concurring opinion, the extent of constitutional limits on Congress' ability to confer standing by statute.

*See generally Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).

*Church and State,* 454 U.S. 464, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (*Valley Forge*), it has emphasized the difference between the two: Congress may discard the prudential standing rules by statute, thus expanding standing to the full extent permitted by Article III, but may not abrogate the minimum requirements of Article III itself. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (*Gladstone*); *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41 n. 22, 96 S.Ct. 1917, 1925 n. 22, 48 L.Ed.2d 450 (1976) (*Simon*); *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. at 2206.

Because the majority fails to analyze the import of this basic distinction in this case, its discussion of the "citizen suit" provisions of the FWPCA (Act) is in several important respects somewhat overbroad. I agree that Gonzales has not met the constitutional prerequisites for standing. Having thus failed to establish a justiciable case or controversy under Article III, Gonzales cannot rely on section 505(a)(2) of the Act, 33 U.S.C. § 1365(a)(2), to establish his right to challenge the EPA's conduct. Insofar as the majority implies that congressional intent may alter this conclusion, however, I must respectfully disagree.

Article III is the fundamental limitation on the judicial power of the United States. By restricting the federal courts' power of judicial review to the resolution of "cases" and "controversies," Article III ensures that legal questions are decided by the courts only in situations presenting that "concrete adverseness" which sharpens the issues and promotes realistic, informed decisionmaking, *see Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), and prevents the courts from overreaching their proper, limited role in our democratic society, *see Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 221–27, 94 S.Ct. 2925, 2932–35, 41 L.Ed.2d 706 (1974). By prohibiting the exercise of judicial authority merely for "the ventilation of public grievances or the refinement of jurisprudential understanding," *Valley Forge, supra,* 102 S.Ct. at 759, Article III thus

defines the essential role assigned to the judiciary among the three coequal branches of our constitutional republic. *Id.; Simon, supra,* 426 U.S. at 39, 96 S.Ct. at 1924; *Flast v. Cohen,* 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968).

The "case or controversy" requirement, of course, does not obviate the duty of the federal courts to vindicate constitutionally-protected individual rights, to protect the allocation of power between the state and national governments which serves as the bedrock for our delicate balance of federalism, and to interpret and enforce acts of Congress insofar as they are consistent with the Constitution. Article III, however, "is every bit as important in its circumscription of the judicial power of the United States as in its granting of that power...." *Valley Forge, supra,* 102 S.Ct. at 760. Where a litigant lacks Article III standing to challenge the action sought to be adjudicated, it is the constitutional obligation of the federal court to dismiss the lawsuit. Where a litigant establishes his standing under Article III, and squarely and properly raises the issue of the legality of governmental conduct, it is the correlative obligation of the judiciary to address his claims on the merits. Either way, there can be no blinking at the consequences.

The irreducible minimum requirements of Article III do not represent mere policies which the federal courts can expand *sua sponte* in an effort to treat more hospitably the merits of a litigant's claims, or to reach and affirm the legality of the challenged conduct. Our authority under Article III "exists only to redress or otherwise to protect against" some threatened or actual injury to the complaining party which may fairly be traced to the allegedly unlawful conduct of the defendant. *Warth v. Seldin, supra,* 422 U.S. at 499, 95 S.Ct. at 2205. Where a litigant does not meet these constitutional prerequisites, he may not invoke the judicial power of the United States, nor may the federal courts permit him to do so. *Valley Forge, supra,* 102 S.Ct. at 760; *Simon, supra,* 426 U.S. at 38, 96 S.Ct. at 1924. If we go further than that, we not only

overstep our designated role in the constitutional scheme, but erode the public confidence and respect on which judicial authority ultimately rests in a democratic society. *United States v. Richardson,* 418 U.S. 166, 188, 94 S.Ct. 2940, 2952, 41 L.Ed.2d 678 (1974) (Powell, J., concurring).

As an aspect of Article III, the party invoking the court's authority must demonstrate "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." *Baker v. Carr, supra,* 369 U.S. at 204, 82 S.Ct. at 703. This, in turn, involves three separate but interrelated components:[1] First, a "distinct and palpable" injury to the plaintiff, *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. at 2206, be it "actual or threatened," *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973); second, a "fairly traceable causal connection" between that injury and the challenged conduct of the defendant, *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978) (*Duke Power*); *Simon, supra,* 426 U.S. at 41, 96 S.Ct. at 1925; and third, a "substantial likelihood" that the relief requested will redress or prevent the injury. *Duke Power, supra,* 430 U.S. at 75 n. 20, 98 S.Ct. at 2631 n. 20. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). The third element, redressability, is clearly a *constitutional* aspect of the standing doctrine. *See, e.g., Gladstone, supra,* 441 U.S. at 100, 99 S.Ct. at 1608; *Simon, supra,* 426 U.S. at 38, 41, 43–44, 96 S.Ct. at 1925, 1926–1927; *id.* at 64, 96 S.Ct. at 1936 (Brennan, J., concurring). The majority concludes that Gon-

zales has failed to meet this last requirement. With this holding, I agree.

As they have evolved to this date, the prudential aspects of the standing doctrine, like the constitutional aspects, are also three-fold:[2] (1) the plaintiff must assert his own rights, and "cannot rest his claim to relief on the legal rights or interests of third parties," *Warth v. Seldin, supra,* 422 U.S. at 499, 95 S.Ct. at 2205; (2) "even where the plaintiff has alleged redressable injury sufficient to meet the requirements of Article III," *Valley Forge, supra,* 102 S.Ct. at 760, if that injury is "shared in substantially equal measure by all or by a large class of citizens" it represents a "generalized grievance" not normally appropriate for a judicial resolution, *Warth v. Seldin, supra,* 422 U.S. at 499, 95 S.Ct. at 2205; and (3) the plaintiff's interest must be "within the zone of interests to be protected or regulated" by the statute or constitutional guarantee in question. *Gladstone, supra,* 441 U.S. at 100 n. 6, 99 S.Ct. at 1608 n. 6; *Association of Data Processing Service Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

The relation between the constitutional and prudential aspects of standing, as well as the inclusion of both causation and redressability in the constitutional portion of the doctrine, is crucial to this case, which arises under a congressional statute granting standing to any interested "citizen." Clearly, Congress cannot by statute vest the federal courts with jurisdiction to hear lawsuits that do not present a case or controversy under Article III or that are otherwise not within the limited jurisdiction which Article III grants the federal courts. Congress may, however, "grant an express right of action to persons who otherwise would be barred by prudential standing

---

1. *See generally Valley Forge, supra,* 102 S.Ct. at 758–59; *Larson v. Valente,* ---- U.S. ----, 102 S.Ct. 1673, 1676 & n. 5, 72 L.Ed.2d 33 (1982) (Rehnquist, J., dissenting); *Pacific Legal Foundation v. State Energy Resources & Development Comm'n,* 659 F.2d 903, 910–11 (9th Cir. 1981); *Chadha v. INS,* 634 F.2d 408, 418 (9th Cir. 1980), *cert. granted,* 454 U.S. 812, 102 S.Ct. 87, 70 L.Ed.2d 80 (1981); *Legal Aid Society v. Brennan,* 608 F.2d 1319, 1333 (9th Cir.

1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980); *Boating Industry Ass'ns v. Marshall,* 601 F.2d 1376, 1380–81 (9th Cir. 1979); *Bowker v. Morton,* 541 F.2d 1347, 1349 (9th Cir. 1976).

2. *See generally Valley Forge, supra,* 102 S.Ct. at 759–60; *Legal Aid Society v. Brennan, supra,* 608 F.2d at 1336 & n. 31.

rules." *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. at 2206. Congress may by statute create new interests the invasion of which will result in injury to a litigant. *See, e.g., Simon, supra,* 426 U.S. at 41 n. 22, 96 S.Ct. at 1925 n. 22; *Schlesinger v. Reservists Committee to Stop the War, supra,* 418 U.S. at 224 n. 14, 94 S.Ct. at 2933 n. 14; *Linda R.S. v. Richard D., supra,* 410 U.S. at 617 n. 3, 93 S.Ct. at 1148 n. 3. Nonetheless, even "[w]hen Congress has so acted, the requirements of Art. III remain...." *Simon, supra,* 426 U.S. at 41 n. 22, 96 S.Ct. at 1925 n. 22. As the Court has recently explained:

> Congress may, by legislation, expand standing to the full extent permitted by Art. III, thus permitting litigation by one "who otherwise would be barred by prudential standing rules." ... In no event, however, may Congress abrogate the Art. III minima: A plaintiff must always have suffered "a distinct and palpable injury to himself" ... that is likely to be redressed if the requested relief is granted.

*Gladstone, supra,* 441 U.S. at 100, 99 S.Ct. at 1608 (citations omitted). *See generally* Bice, *Congress' Power to Confer Standing in the Federal Courts, in* Constitutional Government in America 291–303 (R. Collins ed. 1979).

The majority does not give sufficient attention to this basic and important distinction between constitutional and prudential standing limitations. Congressional legislation can do no more than expand standing to the full extent permitted by Article III. For example, Congress may, in a particular statutory grant of a right of action, permit litigants to sue to enforce the interests of third parties or to act as "private attorneys general" to vindicate the public interest in disputes that would otherwise be considered nonjusticiable "generalized grievances." *Gladstone, supra,* 441 U.S. at 100, 99 S.Ct. at 1608; *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. at 2206. In addition, Congress may by statute amend the Administrative Procedure Act to eliminate the prudential "zone of interest" test. *See Gladstone, supra,* 441 U.S. at 100 n. 6, 99 S.Ct. at 1608 n.

6. When, however, Congress purportedly acts to grant standing, there are two clear and separate judicial inquiries: whether Congress intended to dispense with the prudential standards and thus expand standing to the maximum extent permitted by Article III, and whether the particular litigants before the court have sufficiently alleged or established their standing under Article III. *See id.* at 109, 115 & n. 31, 99 S.Ct. at 1612, 1615 & n. 31.

Section 505(a)(2) of the Act, 33 U.S.C. § 1365(a)(2), permits "any citizen" to bring suit against the Administrator of the EPA for his failure to perform any nondiscretionary act or duty. The majority concludes that this section was intended to grant standing to a "nationwide class" of "citizens who allege[ ] an interest in clean water." The majority, however, neglects to add that in section 505(g), 33 U.S.C. § 1365(g), Congress limited the definition of "citizen" to those persons "having an interest which is or may be adversely affected." Far removed from the import of this language is the majority's conclusion that "every citizen [has] a litigable interest in the enforcement of all nondiscretionary acts and duties of the EPA." The nearly identical language of the Administrative Procedure Act has been construed to grant standing only to persons who satisfy the "injury in fact" requirement of Article III. *Association of Data Processing Service Orgs., Inc. v. Camp, supra,* 397 U.S. at 152–54, 90 S.Ct. at 829–30; *Sierra Club v. Morton,* 405 U.S. 727, 732–33, 92 S.Ct. 1361, 1364–65, 31 L.Ed.2d 636 (1972). As the Supreme Court observed recently, "it is clear that the citizen-suit provisions [of the FWPCA] apply only to persons who can claim some sort of injury...." *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 2624, 69 L.Ed.2d 435 (1981) (*Middlesex County*).

Congress, therefore, did not intend in section 505(a)(2) to grant standing to non-injured members of the public. *See id.; J.E. Brenneman Co. v. Schramm,* 473 F.Supp. 1316, 1319–20 (E.D. Pa. 1979). Rather, as

the legislative history makes clear, Congress intended to expand standing to the full extent permitted by the Court's interpretation of the Constitution. Under *Sierra Club v. Morton, supra,* 405 U.S. at 734, 738, 92 S.Ct. at 1366, 1368, and *United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2416 n. 14, 37 L.Ed.2d 254 (1973), a noneconomic interest in the environment, although admittedly slight, may amount to an injury sufficient under Article III if that interest is "adversely affected" by the governmental conduct challenged. Therefore, an injury sufficient under section 505(a)(2) may consist of environmental damage which adversely affects a plaintiff's use and enjoyment of the clean waters of the United States. Any contrary construction of section 505(a)(2) would be unconstitutional, as it would allow Congress to "abrogate" the minimum Article III requirement that a plaintiff suffer a "distinct and palpable injury to himself." *Gladstone, supra,* 441 U.S. at 100, 99 S.Ct. at 1608; *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. at 2206.

Gonzales, along with the identical complaints of all other plaintiffs, asserts that his use and enjoyment of the Bay has been diminished by the diversion of water-planning funds to other purposes, since the waters of the Bay are not as clean as they would have been had the EPA grant been properly spent only for water planning. This is sufficient to establish an interest "adversely affected" under section 505(a)(2) and injury in fact under Article III because Gonzales asserts that he is "among the injured." *United States v. SCRAP, supra,* 412 U.S. at 687, 93 S.Ct. at 2416; *Montgomery Environmental Coalition v. Costle,* 646 F.2d 568, 578 (D.C. Cir. 1980). Normally, however, this sort of injury might be considered a nonjusticiable generalized grievance, as it is shared in substantially equal measure by all residents of the Bay Area. Yet since it is clear that Congress enacted section 505(a)(2) in order to permit any injured citizen to enforce the Act as a private attorney general, *Middlesex County, supra,* 101 S.Ct. at 2624, the *prudential* limitation denying standing to those presenting gener-

alized grievances is inapplicable. So long as they suffer a distinct and palpable injury to themselves, "persons to whom Congress has granted a right of action, either expressly or by clear implication, ... may invoke the general public interest in support of their claim." *Warth v. Seldin, supra,* 422 U.S. at 501, 95 S.Ct. at 2206.

The importance of the constitutional/prudential distinction in this case now becomes more clear. The citizen-suit provisions of the Act dispense with the prudential limitations by expanding standing to the full extent permitted by Article III. Such a suit cannot be dismissed on the ground that the plaintiff is asserting the rights of third parties or is attempting to adjudicate a generalized grievance. I would not read the senatorial colloquy quoted in the majority opinion as an attempt to codify citizen standing under the terms of *Sierra Club.* Nor would I read this legislative history as an attempt to confer standing on every citizen, whether or not such a citizen can demonstrate direct injury within the Article III requirement; rather, because congressional enactments enjoy a presumption of constitutionality, I would read the legislative history as conferring standing to anyone who meets the Court's Article III test, whether developed before or after *Sierra Club.*

I therefore would hold that a citizen has standing to sue as such under section 505(a)(2) if he demonstrates injury in fact, causation, and a substantial likelihood of redressability. In other words, I would avoid any conflict between section 505(a)(2) and Article III by holding that Congress intended to permit any citizen who could establish a "case or controversy" to sue in federal court on behalf of the public interest in clean water, but that Congress did not intend to abrogate the second and third elements of the tripartite doctrine of Article III standing. In order to prevail in this appeal, therefore, Gonzales must establish that his injury is fairly traceable to the challenged misappropriation of water planning funds *and* that there is a substantial likelihood that judicial relief could redress

that injury. It is the latter of these upon which he stumbles. And despite the implications to the contrary in the majority opinion, this is a stumbling block imposed by Article III itself, and as such is beyond the power of Congress to remove or modify even if Congress had clearly intended to do so by enacting section 505(a)(2).